Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADVERSARY PROCEEDING |
| | § | NO: |
| v. | § | |
| | § | |
| JAMES FRINZI, JAMES GOODMAN, | § | |
| JASON GOODMAN, and JOSEPH | § | |
| GOODMAN, | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

Scott M. Seidel ("Trustee"), as the trustee of Goodman Networks, Inc. (the "Debtor" or

"Goodman Networks"), the debtor in the above-styled chapter 7 bankruptcy case, files this

Original Complaint against James Frinzi, James Goodman, Jason Goodman, and Joseph Goodman

(collectively, the "Defendants") as the Debtor's former directors and officers for breaches of

fiduciary duties.

1

## I.    INTRODUCTION

1.    In 2017, Goodman Networks emerged from bankruptcy. Rather than operate Goodman Networks as required by its governing corporate documents and in good faith, the Defendants breached their fiduciary duties to the Debtor through a series of complex transactions and involving multiple entities.[1] As a result of their actions and omissions, Goodman Networks defaulted on its obligations and ended up back in bankruptcy.

## II.    JURISDICTION AND VENUE

2.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. Such jurisdiction is core under 28 U.S.C. § 157(b)(2).

3.    To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of a final judgment over any and all such matters.

4.    Venue of this adversary proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

## III.    PARTIES

5.    The Trustee is the Chapter 7 trustee of the Debtor and the Debtor's bankruptcy estate, and the Trustee files this Complaint in such capacity only.

6.    James Frinzi is an individual and a resident of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), James Frinzi may be served with process anywhere he may be found, including his home address: 9204 Eddy Cv., Austin, TX 78735.

7.    James Goodman is an individual and a resident of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), James Goodman may be served with process anywhere he may be found, including his home address: 103 Tomahawk Trail, San Antonio, TX

---

[1] Given the number of entities and individuals involved, a *Glossary of Defined Terms, People, and Entities* is attached to this Complaint as Exhibit 1.

78232; or the address where he regularly transacts business at Genesis Networks Enterprises, LLC, 1354 N. Loop 1604 E, Suite 103, San Antonio, TX 78232.

8.    Jason Goodman is an individual and resident of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Jason Goodman may be served with process anywhere he may be found, including his home address: 6613 Autumn Mist Cove, Little Elm, TX 75068.

9.    Joseph Goodman is an individual and resident of the State of Texas. Pursuant to Federal Rule of Bankruptcy Procedure 7004(b), Joseph Goodman may be served with process anywhere he may be found, including his home address: 37 Old Fredericksburg Road, Boerne, TX 78015.

10.    **Defendants were directors or officers of the Debtor**. Each of the Defendants served as a Director or Officer between May 2017 and October 2021.  James Goodman remained on as Chairman until February 2022.  James Frinzi remained on as CEO until September 2022.

11.    On May 26, 2017, the Debtor's Board of Directors was comprised of five members: John Goodman as Chairman, Jason Goodman, and three nonparties. John Goodman was also the Debtor's CEO. James Frinzi was the Debtor's Vice President, Government Relations.

12.    On February 13, 2020, John Goodman resigned as Chairman but remained a director and CEO.

13.    On information and belief, on February 13, 2020, James Goodman became Chairman of the board of directors. At the time, John Goodman and Mark Keiffer were the only two other remaining directors. Therefore, the board consisted of three total directors.

14.     On February 23, 2020, Mark Keiffer replaced John Goodman as CEO. However, John Goodman continued to serve as the Debtor's Chief Strategy Officer until April 30, 2020, and remained as a director until May 1, 2020.

15.     On May 1, 2020, John Goodman resigned as director and was immediately replaced by Jake Goodman—James Goodman's son.

16.     On September 10, 2020, Mark Keiffer resigned from his position as the Debtor's CEO and was immediately replaced by James Goodman. That same day, Mark Keiffer also resigned from the board of directors. Mark Kieffer's resignation left only two directors: James Goodman as Chairman and Jake Goodman.

17.     On March 22, 2021, Joseph and Jason Goodman became directors. The Debtor's board was now comprised of four directors. James Goodman was Chairman. Jake, Joseph, and Jason Goodman were directors. Also the same day, Jason Goodman replaced James Goodman as the CEO.

18.     On June 8, 2021, Jake Goodman resigned as a director. The Debtor's board now comprised of three directors. James Goodman remained Chairman. Joseph and Jason Goodman remained directors.

19.     On October 20, 2021, Jason and Joseph Goodman resigned as directors. James Goodman was Chairman and the Debtor's sole director. On the same day, Jason Goodman also resigned from his position as the Debtor's CEO and was immediately replaced by James Frinzi.

20.     Thereafter, James Goodman resigned from the board of directors. The Debtor was left without any directors. But James Goodman continued to control the majority shareholder group. James Goodman continued to communicate with and influence James Frinzi.

21.     James Frinzi later resigned from his position as the Debtor's CEO.

## IV.      FACTUAL BACKGROUND

22.      Goodman Networks described itself as a "leading field services company with 2,000 network and electronics technicians, serving customers across the nation."

23.      But most of Goodman Networks' revenue in recent years was derived through its wholly-owned subsidiary, GNET ATC, LLC ("GNET"). GNET was a value-added reseller ("VAR") of other companies' technologies and services.

24.      GNET's revenue accounted for over 80% of Goodman Networks' revenue by 2021.

25.      To some extent, Goodman Networks also kept its field services business operational through another wholly-owned subsidiary, Multiband Field Services, Inc. ("MFS"). This legacy business accounted for less than 20% of Goodman Networks' revenue by 2021.

**A.      The Goodman Brothers controlled and indirectly owned Goodman Networks through a web of entities.**

26.      James, Jason, John, Jonathan, and Joseph Goodman (collectively, the "Goodman Brothers") are brothers that together own over 85% of Goodman Networks' common stock through a web of entities that include Goodman MBE Group, LP (30.6%); Genesis Networks Enterprises, LLC ("Genesis Enterprises") (40.2%); GDMN Family Investments 2, LLC ("GDMN") (6.4%); People NQ Inc. ("People NQ") (3.8%); and JJC & People LLC ("JJC") (4.1%).

27.      Each of the Goodman Brothers own a 20% interest in Goodman MBE Group, LP.

28.      John and James Goodman each own 50% of GDMN.

29.      James Goodman is the sole owner of Genesis Enterprises, People NQ, and JJC.

30.      Accordingly, James Goodman controls about 57.5%, John Goodman controls about 9.3%, and the other Goodman Brothers each control about 6.1% of the voting shares of Goodman Networks.

31.     Because the Goodman Brothers are Hispanic, the Goodman Brothers' significant

ownership in Goodman Networks allows Goodman Networks to qualify as a minority business

enterprise.

**B.     The Debtor emerged from a 2017 bankruptcy with new corporate rules and procedures designed to protect the Debtor and its creditors.**

32.     Goodman Networks emerged from bankruptcy on May 31, 2017, with John

Goodman as CEO and Chairman of the Board of Directors. To reorganize, Goodman Networks

sold $112 million in 8% senior secured notes (the "Notes") to various creditors (the

"Noteholders"). James Goodman purchased some of the Notes. The Notes were secured by, among

other things, the trademarks and other intellectual property of Goodman Networks, GNET, and

MFS. The Notes matured on May 31, 2022.

33.     The Noteholders also received A-1 Preferred Stock in Goodman Networks. At the

time, Goodman Networks had Series A-1, A-2, and A-3 Preferred Stock designated. The A-1

Preferred Stock had a mandatory redemption right upon the occurrence of a deemed liquidation

event, including a direct or indirect sale or conveyance of substantially all of the properties or

assets of Goodman Networks. The majority of the Common Stock shareholders voted to amend

Goodman Networks' certificate of formation in September 2020 to remove this mandatory

redemption right—instead providing for an optional right at Goodman Networks' discretion.

34.     As part of its reorganization, Goodman Networks executed the Sixth Amended and

Restated Shareholders' Agreement (the "2017 Shareholders Agreement"), filed its Third Amended

and Restated Certificate of Formation (the "2017 Certificate of Formation"), and adopted its Third

Amended and Restated Bylaws (the "2017 Bylaws," and collectively, the "2017 Corporate

Documents").

35.     The 2017 Corporate Documents outlined governance matters. For example, the 2017 Bylaws required timely and appropriate notice of nominations for the election of the board of directors. The 2017 Bylaws also required Goodman Networks to have at least three directors and no more than five directors on its board of directors at any given time.

36.     The 2017 Bylaws provide that "each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal as provided by the Shareholders Agreement."

37.     The 2017 Shareholders Agreement required Goodman Networks to keep five directors on its board of directors as long as the Notes and Preferred Shares were outstanding.

38.     The 2017 Bylaws[2] describe how board vacancies could be filled:

Vacancies may be filled by (a) the affirmative vote of the holders of not less than a majority of the total voting power of all issued and outstanding common stock, (b) a majority of the directors then in office (although less than a quorum) or (c) the sole remaining director. Each director so elected shall hold office for a term expiring at the annual meeting of shareholders at which the term of office of the class to which they have been chosen expires or until such director's successor shall have been duly elected and qualified. If there are no directors in office, then an election of directors may be held in accordance with the TBOC. Unless otherwise provided in the Certificate of Formation and subject to the terms of the Shareholders Agreement, when one or more directors shall resign from the Board effective at a future date, a majority of the directors then in office, shall have the power to fill such vacancy or vacancies.

39.     Thus, the 2017 Corporate Documents required the directors to take action whenever there was a vacancy on the board. The remaining directors could either (i) fill the vacancy, or (ii) notify the shareholders of all issued and outstanding common stock, who could affirmatively vote on new directors to fill the vacancy.

---

[2] Upon information and belief, the 2017 Corporate Documents may have been later amended in 2020. However, this provision remained consistent. For example, the Fourth Amended and Restated Bylaws potentially passed sometime from March to June 2020 (the "2020 Bylaws") state, in Section 3.13, that vacancies must be filled in the same way as the 2017 Bylaws.

40.     As of May 26, 2017, the Debtor's Board was comprised of five directors: John Goodman as Chairman, Jason Goodman, and three others—Sherman Edmiston, Mark Keiffer, and Rocco Romanella.

**C.     The Debtor completed an insider transaction to acquire its two major VAR customers.**

41.     After emerging from bankruptcy, Goodman Networks struggled to grow revenue.

42.     In 2019, James Goodman owned and controlled Genesis Enterprises, which is the sole manager and member of Genesis Networks Telecom Services, LLC ("Genesis Networks") and ATC Logistics, Inc. ("ATC"). James Goodman was also the CEO of these three entities.

43.     At this time, Genesis Networks contracted as a VAR for ARRIS Solutions, Inc. ("Arris"), selling Arris's technology on consignment to AT&T.

44.     Also at this time, ATC had contracted as a VAR for FedEx Supply Chain Logistics & Electronics, Inc. ("FedEx"), under which ATC would sell FedEx certain products.

45.     James Goodman offered Goodman Networks an opportunity to buy these two major streams of revenue as a VAR for Arris and FedEx.

46.     To evaluate and complete this transaction, the board of directors appointed a special committee of disinterested parties to review the transaction and provide a recommendation to the uninterested directors. Then, the uninterested directors voted on whether to complete this transaction. The interested board members at the time—James and John Goodman—abstained from the vote.

47.     In September 2019, Genesis Enterprises entered into an agreement to sell these assets to GNET, a wholly-owned subsidiary of Goodman Networks, for $20 million plus a $6 million earnout.

48.    Once the acquisition was complete on September 14, 2019, GNET acted as a VAR for Arris. GNET sold Arris's technologies on consignment to AT&T. GNET's contract with AT&T accounted for over 60% of Goodman Networks' revenue by 2021.

49.    Goodman Networks and its subsidiaries also acted as a VAR for FedEx whereby FedEx would facilitate and pay for Goodman Networks and its subsidiaries to purchase products and shortly thereafter repurchase those products from Goodman Networks and its subsidiaries at a 0.2% markup. This contract with FedEx accounted for over 20% of Goodman Networks' revenue by 2021.

**D.    The Debtor completed an insider transaction to divest its infrastructure and professional services division.**

50.    By March 2020, Goodman Networks' financial struggles were apparent. At the time, John Goodman owned and controlled another company—Goodman Telecom Services, LLC ("Goodman Telecom").

51.    On March 4, 2020, John Goodman proposed to Goodman Networks' board of directors that Goodman Telecom purchase Goodman Networks' Infrastructure Services and Professional Services Divisions.

52.    Before Goodman Networks entered into the transaction, John Goodman resigned as Chairman of the board of directors of Goodman Networks on February 13, 2020, but he remained a director. He also resigned as CEO of Goodman Networks on February 23, 2020, and he resigned as Chief Strategy Officer of Goodman Networks on April 30, 2020.

53.    Knowing that John Goodman would be resigning as Chairman as a result of this transaction and James Goodman would be taking his place, Joseph Goodman emailed the Goodman Brothers on February 12, 2020: "Thanks James for . . . promising to take care of family first." Joseph Goodman also expressed concern that John Goodman's entity should not use the

name Goodman Telecom because "AT&T already calls us the mafia" and he thought "this is sending the wrong message and will be confusing."

54.     James Goodman became Chairman of Goodman Networks on February 13, 2020. On February 23, 2020, Mark Keiffer was elected to replace John Goodman as CEO of Goodman Networks.

55.     On April 30, 2020, Goodman Networks only had three directors: James Goodman (as Chairman), John Goodman, and Mark Keiffer. Because the Notes and Preferred Stock remained outstanding, the board of directors should have had five directors under the 2017 Corporate Documents. Upon information and belief, no immediate efforts were taken to fill the two open director positions as required by the 2017 Corporate Documents. Goodman Networks would operate with only these three directors until May 1, 2020.

56.     The board of directors appointed a special committee of uninterested directors and officers to vet the transaction with Goodman Telecom to ensure the transaction was in the best interest of Goodman Networks and its minority shareholders. The special committee hired outside counsel and advisors to help vet the transaction. Based on the third-party recommendations, the special committee recommended to the board of directors that the transaction was in the best interest of Goodman Networks, and the uninterested directors voted to allow the sale.

57.     On May 1, 2020, John Goodman resigned as a director of Goodman Networks. He was immediately replaced by Jake Goodman—James Goodman's son.

58.     On June 30, 2020, Goodman Networks entered into the transaction with Goodman Telecom. Goodman Networks sold Goodman Telecom its Infrastructure Services and Professional Services Divisions, excluding the distributed antenna system maintained by Goodman Networks

at LSU's campus. In exchange for these divisions, Goodman Telecom paid Goodman Networks $32,511,107 in cash plus $8 million in Class E Units of Goodman Telecom.

**E.     The Debtor continued to struggle financially.**

59.     On September 10, 2020, Mark Keiffer resigned as CEO and from the board of directors of Goodman Networks. James Goodman and his son, Jake Goodman, were the only remaining directors of Goodman Networks. James Goodman was elected CEO. Upon information and belief, no immediate efforts were taken to fill the three open director positions as required by the 2017 Corporate Documents.

60.     Goodman Networks' financial condition had not improved. As CEO and Chairman of the Board, James Goodman knew Goodman Networks was unlikely to meet its debt obligations in the future as the Notes matured on May 31, 2022.

61.     James Frinzi ("Frinzi") was Goodman Networks' Vice President of Government Relations, a role he had held since approximately 2010. Frinzi was a lobbyist with connections in Texas politics. Frinzi was also a friend of the Goodman Brothers, especially James Goodman.

62.     When James Goodman wanted to sell his Notes, he contacted Frinzi. Eager to help his colleague and friend, Frinzi reached out to his friend Shalom Auerbach ("Auerbach"), a New York investment banker. Frinzi planned for Auerbach to purchase the Notes at $0.10 on the dollar from James Goodman. In turn, James Goodman would arrange for Goodman Networks to immediately purchase the Notes at $0.11 on the dollar from Auerbach.

63.     James Goodman cautioned Frinzi about the transaction through electronic messages on a private messaging service called Signal Messenger ("Signal"). James Goodman told Frinzi: "Just remember that you do not know me or the company." Frinzi responded: "I know."

64.    During January 2021, Frinzi and James Goodman discussed the potential of selling up to $35 million worth of Notes back to Goodman Networks in this manner.

**F.    The Debtor completed an insider transaction to divest its e-commerce business.**

65.    On March 22, 2021, two of the open positions on Goodman Networks' board of directors were filled by Jason and Joseph Goodman, who would serve alongside existing directors James and Jake Goodman. Therefore, the board consisted of four of the Goodman Brothers: James Goodman (as Chairman), Jake Goodman, Jason Goodman, and Joseph Goodman. Upon information and belief, no efforts were taken to fill the one open director position as required by the 2017 Corporate Documents.

66.    James Goodman resigned as CEO, and Jason Goodman replaced him.

67.    The four-person board of directors held their first meeting that same day. At the meeting, a motion was made to wind down a portion of Goodman Networks' Amazon e-commerce business because of significant losses. During the meeting, "[i]t was agreed that previous leadership at Goodman did not act, regarding the losses that were taking place, and left the company in an unfavorable cash position."

68.    At the same time, James Goodman proposed his company, Goodman Investment Holdings, LLC ("GIH"), purchase Goodman Networks' failing Amazon e-commerce business.

69.    The board of directors appointed a special committee of directors and officers to vet the transaction to determine whether this proposed insider transaction would be in the best interest of Goodman Networks and its minority shareholders.

70.    After review, on April 12, 2021, the special committee recommended that Goodman Networks sell its e-commerce business to GIH. Based on the special committee's recommendation, the directors approved the transaction.

71.    GIH purchased Goodman Networks' e-commerce business for the return of $10 million worth of Notes after obtaining the vote of non-interested board members and using a special committee.  This would be the last time a special committee was organized to vet an insider transaction.

72.    Shortly thereafter, on June 8, 2021, Jake Goodman resigned as a director of Goodman Networks. Therefore, the board consisted of three of the Goodman Brothers: James Goodman (as Chairman), Jason Goodman, and Joseph Goodman. Because the Notes and Preferred Stock remained outstanding, the board of directors should have had five directors under the 2017 Corporate Documents. Upon information and belief, no efforts were taken to fill the two open director positions as required by the 2017 Corporate Documents.

**G.    James Goodman and Frinzi plan to strip GNET from the Debtor by acquiring it through a new holding company that they would form and own.**

73.    In 2021, the auditors of Goodman Networks issued a report stating that: "the Company ha[d] suffered recurring losses from operations, received a notification of termination of contract from a major customer, ha[d] significant debt maturing in the next 12 months, and ha[d] stated that substantial doubt exists about its ability to continue as a going concern."

74.    By September 2021, Goodman Networks' only material revenue source was through its wholly-owned subsidiary, GNET, which received revenues through its FedEx and AT&T VAR business.

75.    James Goodman and Frinzi knew that Goodman Networks and GNET were not in a position to pay their debts as the debts became due. Therefore, James Goodman presented a few proposed transactions to Goodman Networks' advisors.

76.    James Goodman proposed to Goodman Networks' advisors that James Goodman and Frinzi would form a new holding company that would buy 100% of GNET from Goodman

Networks in exchange for GNET's assumption of all of the obligations under the outstanding Notes.

77.     Before moving GNET out of Goodman Networks, certain material contracts of Goodman Networks would be assigned to GNET.

78.     After these assignments and this transfer, Goodman Networks' cash and operations would be very limited. Goodman Networks would likely be unable to satisfy its remaining accounts payable.

79.     Then, the goal was for GNET to be acquired by a public shell company traded over the counter. James Goodman and Frinzi planned to purchase 95% of the existing stock of the public shell company from its current majority shareholder in exchange for $500,000 in cash.

80.     When presented with this plan, the advisors noted they had concerns about the proposed plan of action.

81.     On October 13, 2021, AT&T sent Goodman Networks and GNET a notice of default under its VAR contract for failing to pay over $30 million owed to Arris and related companies. AT&T gave Goodman Networks and GNET 30 days to cure.

82.     Indeed, Goodman Networks owed Arris over $30 million from its former VAR business with Arris, and Frinzi admitted to Arris that Goodman Networks could not pay its outstanding invoice.  Frinzi also added that he nor anyone else at Goodman Networks had any explanation as to where Arris's money had gone.  In response, AT&T and Arris filed suit against Goodman Networks and GNET to recover their $30 million.

83.     On October 14, 2021, Frinzi emailed Jason Goodman about his idea to have Multiband USA, LLC ("Multiband USA"), a shell company, acquire the profitable assets of GNET

other than the AT&T VAR contracts—its business with Frontier, LSU, and FedEx—by October 31, 2021.

84.    At this point, Jason Goodman knew or should have known Frinzi was plotting to strip Goodman Networks of its assets. Yet, there is no evidence that Jason Goodman acted as a reasonably prudent person would do under the circumstances by alerting the other board members, officers, or shareholders of Frinzi's plans.

**H.    Without following its corporate governance procedures, the Debtor loaned an undercapitalized entity owned and controlled by James Goodman about $6 million.**

85.    Unified Field Services, Inc. ("UFS") was formed and registered with the Texas Secretary of State on April 7, 2021. James Goodman is affiliated with UFS.

86.    Despite the fact that UFS existed for less than a year and lacked historical financial data, Goodman Networks negligently paid $5,986,898 of UFS's expenses from June to September 2021, purportedly in exchange for UFS's promise to repay Goodman Networks. However, Goodman Networks never took any action to get UFS to repay this obligation.

87.    On or about October 15, 2021, Frinzi, Jason Goodman, and Joseph Goodman set out to draft an unsecured promissory note between Goodman Networks and UFS to memorialize UFS's obligation to repay the amounts Goodman Networks paid on UFS's behalf.

88.    In response on October 15, 2021, and only after Goodman Networks already transferred $5,986,898.00 on UFS's behalf, UFS claimed it incurred fees of $2,321,832 that were caused by Goodman Networks that should offset any amount UFS owed Goodman Networks. Therefore, UFS countered that the promissory note should only reflect a repayment of $3,665,066.

89.    Despite the fact that UFS suggested it would sign a document memorializing an obligation to repay $3,665,066, it appears that neither Goodman Networks nor UFS ever signed a promissory note to memorialize the agreement. The Trustee has no record documenting the board

of directors—now comprised of Joseph, Jason, and James Goodman—ever took the steps a reasonably prudent person under similar circumstances would have taken to obtain UFS's signature on a promissory note to memorialize UFS's obligation to repay Goodman Networks.

90.    Similarly, the Trustee has no record documenting the board of directors ever performed any due diligence on this transaction as reasonably prudent persons would have undertaken under similar circumstances. No record exists of the board of directors appointing a special committee of uninterested officers and directors to evaluate the transaction as required by the 2017 Corporate Documents and as reasonably prudent persons would have undertaken under similar circumstances. And although James and Joseph Goodman were aware of the transaction, the board negligently failed to evaluate whether Goodman Networks would likely be repaid. Thus, the board of directors' negligent failure to oversee Goodman Networks led to Goodman Networks loan to UFS.

91.    At no time did Goodman Networks take any action to collect on the obligations owing to it by UFS.  In late 2023, the Trustee sued UFS on this debt and secured a final judgment against UFS in the amount of $5,986,897.69, plus attorney's fees.  By that time, however, UFS was out of business and the Trustee has not been able to collect on his judgment.

**I.    After voting to appoint Frinzi as the Debtor's CEO, Jason and Joseph Goodman resigned from the board, leaving James Goodman as the sole director.**

92.    By October 13, 2021, the Goodman Brothers and Frinzi knew Goodman Networks was insolvent and faced imminent litigation from Arris, AT&T, and related companies.

93.    By October 14, 2021, the directors knew or should have known of Frinzi's plan to strip Goodman Networks of its only remaining profitable assets.

94.    By October 20, 2021, Jason and Joseph Goodman were also made aware of the existence of the UFS "loan," UFS was an affiliate of James Goodman, there was no promissory

note executed that documented UFS's obligation to repay Goodman Networks $5,986,897.69, UFS owed large sums of money to Goodman Networks, and Goodman Networks was doing nothing to collect on this debt.

95.     On October 20, 2021, rather than alert the board of Frinzi's plan, Jason Goodman resigned from his position as CEO, knowing that Frinzi would be named as his replacement. James, Jason, and Joseph Goodman immediately voted to elect Frinzi as the new CEO of Goodman Networks, GNET ATC, and Multiband. James, Jason, and Joseph Goodman failed to act as reasonably prudent persons would under similar circumstances when they knew or should have known that Frinzi—who had an existing plan to strip Goodman Networks of its only remaining profitable assets—was going to be elected as the new CEO of Goodman Networks.

96.     Jason and Joseph Goodman resigned from the board of directors effective immediately after Frinzi was elected. Jason and Joseph Goodman failed to act as reasonably prudent persons would under similar circumstances when they knew or should have known that James Goodman would be the only remaining director of Goodman Networks.

97.     On October 22, 2021, Jason Goodman emailed Goodman Networks' employees, copying Joseph Goodman, "Let's focus on getting this in order with [Goodman Networks] and its wind down . . . Settling with UFS can be done as we get to it. It's not the current priority."

98.     By resigning without advanced notice, Jason and Joseph Goodman did not act as reasonably prudent persons would under similar circumstances by providing the shareholders with notice or any opportunity to elect their replacements. As a result of their resignations, James Goodman immediately became the sole director of Goodman Networks. With James Frinzi as CEO, the two now controlled Goodman Networks without any oversight from additional board members.

99.    At the time of their resignations, Jason and Joseph Goodman were aware that James Goodman used Goodman Networks' money to pay UFS expenses while a lawsuit with AT&T or Arris was imminent. Jason Goodman was also aware that Frinzi was evaluating misappropriating company assets to Multiband USA. As such, Jason and Joseph Goodman not only resigned in the face of corporate wrongdoing—they negligently left the company in the control of the wrongdoers.

**J.    While pretending to wind down the Debtor, Frinzi and James Goodman caused the Debtor to accumulate large amounts of cash which they planned to siphon.**

100.    On October 18, 2021, Frinzi hired SierraConstellation Partners as a consultant to help evaluate Goodman Networks' options given its current challenges.

101.    On October 29, 2021, Frinzi and James Goodman hired yet another set of advisors for Goodman Networks to help wind up the company. These new advisors cautioned against transferring Goodman Networks' assets to principals or affiliates.

102.    In November 2021, Arris sued Goodman Networks, GNET, Frinzi, James Goodman, Jason Goodman, and Brad Kozma in Bexar County, Texas for breach of contract and other causes of action.

103.    Also in November 2021, Frinzi and James Goodman ordered Goodman Networks, GNET, and Genesis Networks to hold any payments owed to FedEx.

104.    Frinzi and James Goodman's decision to halt FedEx payments allowed Goodman Networks to accumulate over $80 million in cash.

105.    Yet, on November 23, 2021, Frinzi signed an 8-K filing for Goodman Networks stating "Goodman Networks no longer has any remaining revenue sources. At this point in time, a Shareholder's Meeting will be requested to dissolve the Company."

106.    On December 1, 2021, James Goodman and Frinzi revoked Jason Goodman's authority to sign on Goodman Networks' or GNET's bank accounts. Frinzi and James Goodman

gave each other permission to sign individually on behalf of Goodman Networks for transactions up to $100,000, while transactions over $100,000 would require both their signatures.

**K.      Frinzi and James Goodman caused the Debtor to forgive UFS's almost $6 million debt without consideration.**

107.    In 2021, Goodman Networks' accounting team started reviewing the books for year-end and recognized that Goodman Networks was owed $5,986,898 from UFS. Neither Goodman Networks nor UFS appeared to have executed a promissory note for this amount.

108.    Despite the fact that Goodman Networks had paid $5,986,898 to pay UFS's expenses, James Goodman and UFS were still insisting UFS would only agree to repay $3,665,066 because UFS had purportedly incurred fees of $2,321,832 that were owed by Goodman Networks that they believed should offset any amount UFS owed Goodman Networks.

109.    A Goodman Networks' employee emailed Frinzi and Jason and Joseph Goodman to explain "[t]he UFS total includes 2,321,831.89 in disputed and/or charge backs" and that UFS still needs "to provide support for their disputed and charge back items" or Goodman Networks "just needs to concede and write down/off the 2,321,831.89 as we likely and ultimately realize that none of the note receivable will likely be paid or collected."

110.    Joseph Goodman responded and directed the Goodman Networks employee "to get the 3,665,065.80 approved and booked . . . . [sic] with the intentions of continuing negotiations on the remaining 2,321,831.89."

111.     Frinzi also responded, "we aren't in a position to write anything off. We probably just need to settle on a fair amount and call it a day."

112.    The employee responded, explaining that Goodman Networks "settling for a lesser amount would be a write off."

113.    In 2021, Goodman Networks wrote off the entire $5,986,898 balance that UFS owed it.

114.    The Trustee has no record documenting that James Goodman, as sole director, or Frinzi, as CEO, ever performed any meaningful analysis of whether to forgive UFS's debt or how much of UFS's debt to write off. No record exists of the board of directors appointing a special committee of uninterested officers and directors to evaluate this transaction. Thus, James Goodman and Frinzi failed to act as reasonably prudent persons would under similar circumstances when they authorized Goodman Networks to write off the UFS loan.

115.    The Trustee filed an adversary proceeding against UFS on November 1, 2023, No. 23-03088-mvl (N.D. Tex. Nov. 1, 2023), for breach of the supposed loan agreement of $5,986,898, which remains wholly unpaid.  In response, UFS admitted all of the allegations against it and agreed it owed the full amount.  The Court entered a judgment against UFS in favor of Goodman Networks for $5,986,898 plus attorneys' fees, costs, expenses, and post-judgment interest.  *See* ECF No. 8, *in* No. 23-03088-mvl.

**L.     Frinzi usurped the Debtor's corporate opportunity to purchase 1Path and AMRR using millions of dollars he syphoned from the Debtors.**

116.    In 2021, SierraConstellation Partners recommended restructuring Goodman Networks through a potential business combination where GNET would acquire Onepath Systems, LLC ("1Path") to increase earnings and propel liquidity to pay creditors back.

117.    Rather than utilize this corporate opportunity for the benefit of Goodman Networks, Frinzi made plans to seize this opportunity for himself by acquiring a public shell company, American Metals Recovery and Recycling, Inc. ("AMRR"), who would then acquire 1Path with James Goodman but without Goodman Networks or GNET.

118.    In 2021, Frinzi created an entity called Multiband Global Resources, LLC ("MGR"). Although James Goodman and Frinzi originally planned to jointly own 95% of the new entity, James Goodman never owned or controlled MGR.

119.    In 2021, Repository Services, LLC ("Repository") entered a share purchase agreement with MGR under which MGR agreed to buy 71.31% of the common stock and 100% of the preferred stock of AMRR for $500,000.

120.    Frinzi and James Goodman discussed on Signal plans to arbitrage Goodman Networks shares. Frinzi planned to use AMRR to buy Goodman Networks shares at a discount and flip them later while also using AMRR to buy 1Path. Frinzi told James Goodman that the "restructuring plan is bulletproof and will lead to us each owning our own home in La Jolla." James Goodman responded: "Let's get the GTS and FedEx deal done."

121.    In 2021, Frinzi caused Goodman Networks to pay $500,000 to Stauber Law Office, who acted as an escrow agent for MGR. Goodman Networks did not receive anything in exchange for this $500,000 payment. James Goodman failed to act as a reasonably prudent person would under similar circumstances by not ensuring corporate controls or procedures were followed to determine whether this payment was in Goodman Networks' best interests.

122.    Stauber Law Office then paid the money to David Hill of Hill Innovative Law, LLC, an escrow agent for Repository, the original owner of AMRR and seller of its shares.

123.    This transaction closed in 2021, at which point MGR owned and controlled AMRR. Frinzi owned and controlled MGR.

124.    Goodman Networks then agreed to loan $44 million to the undercapitalized shell company AMRR in exchange for a promissory note. Upon information and belief, Frinzi never anticipated AMRR would repay the promissory note.

125.    Thereafter, Goodman Networks wired $44 million to AMRR from its bank account (ending in 4352) in the following increments: (i) $8 million; (ii) $8 million; (iii) $8 million; (iv) $7,925,000; (v) $8 million; and (vi) $4,075,000. James Goodman failed to act as a reasonably prudent person would under similar circumstances by not ensuring corporate controls or procedures were followed to determine whether these payments were in Goodman Networks' best interests.

126.    Ultimately, AMRR acquired 1Path and became its sole member.

127.    One day later, AMRR acquired AMR Resources, LLC ("AMR"), the operator of Onepath Integrated Services division of 1Path, and 1Path became AMR's sole member.

128.    MGR, AMRR, 1Path, and AMR are entities all owned or controlled by Frinzi.

**M.    Frinzi siphoned $4.4 million of the Debtor's cash to MGR, his own entity.**

129.    On January 4, 2022, Frinzi caused Goodman Networks to loan MGR $4.4 million purportedly in exchange for a promissory note. MGR existed for less than six months at the time. Upon information and belief, the promissory note was not executed by MGR—as copies of it do not appear in Goodman Networks' corporate records—and it was never anticipated that MGR would repay the loan to Goodman Networks.

130.    Goodman Networks wired $4.4 million to MGR from Goodman Networks' bank account at East West Bank (account ending in 8462).

131.    Ultimately, Goodman Networks did not receive anything of value in exchange for the $4.4 million payment. No corporate controls or procedures were followed to ensure this $4.4 million alleged loan was in Goodman Networks' best interests.

132.    To date, MGR has not repaid any portion of this alleged loan to the Debtor.

**N.     The Debtor is forced into bankruptcy.**

133.    As a result of the negligent acts and omissions described above, over $54 million

was transferred from Goodman Networks, leaving its creditors with virtually nothing.

| Transfers from the Debtor Negligently Vetted by Directors / Officers | |
|---|---|
| **Transferees** | **Amount Transferred** |
| UFS | $ 5,986,898 |
| MGR | $ 4,400,000 |
| MGR AMRR | $ 44,500,000 |
| **Total Transferred from the Debtor** | **$ 54,886,898** |

134.    On September 6, 2022, creditors filed an involuntary petition against Goodman

Networks, initiating the above-styled chapter 7 bankruptcy case.

## V.      CAUSES OF ACTION

**COUNT 1 :   BREACH OF FIDUCIARY DUTY – DUTY OF DUE CARE (AGAINST JAMES GOODMAN)**

135.    The Trustee incorporates his allegations above.

136.    The fiduciary duty of due care requires corporate directors to exercise the degree

of care which a person of ordinary prudence would exercise under the same or similar

circumstances. This duty includes the duty to use ordinary care  in the supervision of other officers

and directors regarding whether they are acting for the benefit of the corporation.

137.    James Goodman was Chairman of Goodman Networks' Board of Directors from

February 23, 2020 to February 1, 2022.

138.    During his tenure as Chairman, James Goodman was negligent and breached his

duty of ordinary care to Goodman Networks when James Goodman failed to adequately supervise

Frinzi, failed to ensure reasonable corporate controls and procedures were used to vet proposed

transactions, and allowed Frinzi to cause the Debtor to:

    a.   Transfer $500,000 to Stauber Law Office, as an escrow agent of MGR, without receiving adequate consideration;

    b.   Transfer $44 million to AMRR, an undercapitalized shell company, without receiving adequate consideration; and

    c.   Transfer $4.4 million to MGR, without receiving adequate consideration.

139.    Each of these breaches resulted in injury to Goodman Networks, its shareholders, and its creditors.

140.    These breaches resulted in injury to Goodman Networks, its shareholders, and its creditors in an amount no less than $48.9 million.

## COUNT 2 :    BREACH OF FIDUCIARY DUTY – DUTY OF DUE CARE (AGAINST JASON GOODMAN AND JAMES FRINZI)

141.    The fiduciary duty of due care requires corporate directors to exercise the degree of care which a person of ordinary prudence would exercise under the same or similar circumstances. This duty includes the duty to use ordinary care in the supervision of other officers and directors regarding whether they are acting for the benefit of the corporation or in their own self-interest.

142.    An interested-director transaction is a transaction between a corporation and one or more affiliates or associates of any of the corporation's directors, or any entity in which one or more of the corporation's directors or any affiliate or associate of a director is a managerial official or has a financial interest.

143.    An interested-director transaction is only valid if: (i) the board or a board committee by a majority of disinterested directors or committee members or a corporation's shareholders entitled to authorize the transaction approve the transaction in good faith after disclosure of or with

knowledge of the material facts of the transaction and the director's interest; and (ii) the transaction was fair to the corporation when it was authorized, approved, or ratified.

144.    James Goodman was Chairman of Goodman Networks' Board of Directors from February 23, 2020 to February 1, 2022. UFS was newly formed, undercapitalized, and affiliated with James Goodman.

145.    James Frinzi was Vice President of Goodman Networks from 2010 until he was appointed CEO on October 20, 2021.

146.    Jason Goodman was CEO of Goodman Networks from March 22, 2021 to October 20, 2021.

147.    During their tenures as officers, Frinzi and Jason Goodman breached their duties of due care to Goodman Networks by negligently failing to supervise, allowing Goodman Networks to enter the UFS transaction when Frinzi and Jason Goodman caused the Debtor to pay approximately $5,986,898 of expenses from June to September 2021 of UFS without a promissory note memorializing UFS's obligation to repay $5,986,898 borrowed and without taking any action to collect on this debt.

148.    This unsecured loan of $5,986,898 to James Goodman's company, UFS, was not approved by the Debtor's board, board committee, or shareholders.

149.    The Debtor's board or a board committee did not undertake any process to ensure this unsecured loan of $5,986,898 to James Goodman's company UFS was fair for Goodman Networks.

150.    On information and belief, Jason Goodman and Frinzi failed to exercise ordinary care to identify and seek to halt any the unsecured loan payments, alerted other shareholders, or alerted other board members to take action.

151.   This unsecured loan of $5,986,898 to UFS occurred while Jason Goodman and Frinzi were officers with a fiduciary duty to exercise ordinary care in the supervision of loan transactions and alert the other shareholders or board members to take action.

152.   Frinzi breached his duty of care when he allowed Goodman Networks to completely write off the debt created from the unsecured loan payments to UFS: (a) without determining whether this write off was in Goodman Networks' best interest; (b) without following adequate corporate controls or procedures; and (c) even though UFS owed Goodman Networks $5,986,898.

153.   These breaches resulted in injury to Goodman Networks, its shareholders, and its creditors in an amount of $5,986,898.

## COUNT 3 :   BREACH OF FIDUCIARY DUTY – DUTY OF OBEDIENCE (AGAINST JAMES, JASON, AND JOSEPH GOODMAN)

154.   The Trustee incorporates his allegations above.

155.   Directors owe a fiduciary duty of ordinary care to be obedient to the law and corporate bylaws.

156.   James Goodman was Chairman of Goodman Networks' board of directors from February 23, 2020 to February 1, 2022.

157.   Jason and Joseph Goodman became directors of Goodman Networks on March 22, 2021. Jason and Joseph Goodman joined the existing board members—James Goodman and his son, Jake Goodman.

158.   Jake Goodman resigned as a director on June 8, 2021, leaving James, Jason, and Joseph Goodman as directors.

159.   On October 20, 2021, Jason and Joseph Goodman resigned and left James Goodman as the Chairman and sole director of Goodman Networks.

160.    The 2017 Corporate Documents required the board of directors to be comprised of at least three directors at all times and five directors while the Notes and Preferred Shares were outstanding. The 2017 Corporate Documents required that when a vacancy occurred the remaining directors to take action to fill the vacancy.

161.    James, Jason, and Joseph Goodman were the Debtor's directors. They were negligent and breached their duties of obedience and ordinary care to the Debtor by failing to fulfill their duties under the Debtor's bylaws when they failed to appoint additional directors to the required number by the 2017 Corporate Documents.

162.    When the Debtor's board of directors had two vacancies on its required five-member board, the remaining directors—James, Jason, and Joseph Goodman—should have exercised ordinary care in taking action to fill the vacancies. Under the 2017 Corporate Documents, they could have filled an open vacancy by their own majority vote, or they could have notified the shareholders to fill the open vacancies. By failing to take action, all three directors breached their fiduciary duties.

163.    Similarly, when Jason and Joseph Goodman resigned as directors, James Goodman should have taken immediate action to fill the vacancies. By failing to do so, he breached his duty of obedience again.

164.    Because of James, Joseph, and Jason Goodman's actions or omissions, a full board of directors was not in place to oversee the operations of Goodman Networks and ensure its assets were being utilized in transactions that were fair to the Debtor.

165.    Full board oversight as required by the 2017 Corporate Documents would have prevented Frinzi's and James Goodman's breaches of fiduciary duties as described in Counts I and III above.

166.    Each of these breaches resulted in injury to Goodman Networks, its shareholders, and its creditors.

167.    These breaches resulted in injury to Goodman Networks, its shareholders, and its creditors of $54,886,898.

**COUNT 4:    BREACH OF FIDUCIARY DUTY – DUTY OF LOYALTY AND DUE CARE FOR RESIGNING IN THE FACE OF CORPORATE WRONGDOING (JASON AND JOSEPH GOODMAN)**

168.    The Trustee incorporates his allegations above.

169.    A company's directors and officers owe it a duty of loyalty. When faced with knowledge that a company's controls are inadequate, the directors must exercise ordinary care to prevent further wrongdoing from occurring. resigning from a board or leaving the company in the hands of a wrongdoer is negligent and thus violates their fiduciary duty.

170.    Jason and Joseph Goodman negligently failed to identify corporate wrongdoing and then resigned without exercising reasonable care to assure the corporation was left with adequate corporate controls.

171.    For example, on October 14, 2021, Jason Goodman with reasonable care should have known that Frinzi was contemplating having Frinzi's entity, Multiband USA, acquire profitable assets of GNET—its business with Frontier, LSU, and FedEx—to strip value out of the Debtor and leave the Debtor unable to pay its creditors. Yet, Jason Goodman negligently failed to act and in fact resigned without adequate protections in place. Moreover, when Jason Goodman was CEO and both Jason and Joseph Goodman were directors, Jason and Joseph Goodman were negligent and unaware that Goodman Networks loaned an unsecured $6 million to UFS to cover UFS's expenses from June to September 2021. Jason and Joseph Goodman should have known that UFS was newly-formed, and was undercapitalized. Yet, Jason and Joseph Goodman made no

effort to notify the other officers or shareholders and in fact negligently resigned without adequate protections in place.

172.     Instead, Jason and Joseph Goodman resigned as directors on October 20, 2021. Jason Goodman also resigned as CEO on October 20, 2021.

173.     Jason and Joseph Goodman left the Debtor in the hands of James Goodman as Chairman (and the sole director) and Frinzi as the new CEO.

174.     Jason and Joseph Goodman negligently left James Goodman and Frinzi without adequate board oversight of five directors as required by the 2017 Corporate Documents.

175.     Almost immediately after Jason and Joseph Goodman resigned, Goodman and Frinzi caused Debtor to enter into transactions that were not in the Debtor's best interests.

176.     Jason and Joseph Goodman breached their duty of loyalty by leaving the Debtor in the hands of James Goodman and Frinzi.

177.     These breaches resulted in injury to Goodman Networks, its shareholders, and its creditors in an amount no less than $54,886,898.

## COUNT 5:   BREACH OF FIDUCIARY DUTY – DUTY OF LOYALTY AND DUE CARE FOR RESIGNING IN THE FACE OF CORPORATE WRONGDOING (AGAINST JAMES GOODMAN)

178.     The Trustee incorporates his allegations above.

179.     A company's directors and officers owe it a duty of loyalty. When faced with knowledge that a company's controls are inadequate, the directors must exercise ordinary care to prevent further wrongdoing from occurring. Resigning from a board or leaving the company in the hands of a wrongdoer is negligence and violates the fiduciary duties owed by these defendants.

180.     James Goodman should have known that the Debtor was insolvent on October 13, 2021.

181.    James Goodman through the exercise of reasonable care should have known that the Debtor transferred $500,000 to MGR through Stauber Law Office, $4.4 million to MGR, and $44 million to AMRR. Each of these transfers benefited Frinzi.

182.    Yet, James Goodman negligently failed to appoint independent directors (or any more directors) as the 2017 Corporate Documents require or notify other officers and shareholders. James Goodman negligently failed to stop Frinzi.

183.    Instead, James Goodman resigned as Chairman.

184.    James Goodman left Frinzi at the helm of the company as CEO without any board oversight.

185.    Almost immediately after James Goodman resigned, Frinzi arranged transactions that were not in the Debtor's best interests.

186.    James Goodman breached his duties of loyalty and due care by leaving the Debtor in the hands of Frinzi without board oversight.

187.    These breaches resulted in injury to Goodman Networks, its shareholders, and its creditors.

## VI.    PRAYER

The Trustee respectfully requests judgment for:

a.  Actual damages;

b.  Pre-judgment and post-judgment interest;

c.  Costs of suit; and

d.  All other relief the Court deems appropriate.

RESPECTFULLY SUBMITTED this 7th day of June 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Jamil Alibhai*
_____
     Davor Rukavina
     Texas Bar No. 24030781
     drukavina@munsch.com
     Jamil N. Alibhai
     Texas Bar No. 00793248
     jalibhai@munsch.com
     Thomas D. Berghman
     Texas Bar No. 24082683
     tberghman@munsch.com
     Claire E. Carroll
     Texas Bar No. 24092224
     ccarroll@munsch.com
     Brenda Funk
     Texas Bar No. 24012664
     bfunk@munsch.com
     J. Blake Glatstein
     Texas Bar No. 24123295
     bglatstein@munsch.com
     500 N. Akard Street, Ste. 4000
     Dallas, Texas 75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584

**COUNSEL FOR SCOTT SEIDEL, TRUSTEE**