Exhibit 1

Execution Version

## SIXTH AMENDED AND RESTATED SHAREHOLDERS' AGREEMENT

THIS SIXTH AMENDED AND RESTATED SHAREHOLDERS' AGREEMENT (the "Agreement"), is made as of the 31st day of May, 2017, by and among Goodman Networks Incorporated, a Texas corporation (the "Corporation"), the holders of claims identified on Schedule A hereto, the individuals and entities who sign this Agreement below, and any other individual or entity that may become a party to this Agreement after the date hereof and pursuant to the terms hereof.

WHEREAS, the Corporation and certain of its common and preferred shareholders are parties to that certain Fifth Amended and Restated Shareholders' Agreement, as amended, made as of June 23, 2011 (the "Fifth Amended and Restated Agreement"), by and among the Corporation and the shareholders set forth therein;

WHEREAS, the Corporation and the Shareholders are entering into this Agreement pursuant to the terms of the Debtors' Amended Joint Prepackaged Chapter 11 Plan of Reorganization confirmed by the Findings of Fact, Conclusions of Law, and Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Amended Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code dated May 4, 2017 of the United States Bankruptcy Court for the Southern District of Texas in the chapter 11 case commenced by the Corporation and certain of its subsidiaries (the "Plan") and wish to state herein their mutual agreements as set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1.     Definitions.  The following terms used in this Agreement shall have the meaning set forth below:

"AAA" shall mean the American Arbitration Association.

"AAA Rules" shall mean the rules of the AAA governing commercial arbitration.

"Acceptance Notice(s)" shall have the meaning set forth in Section 3(b).

"Affiliate" shall mean, with respect to a specific Person, (i) any Person which directly or indirectly controls, is controlled by, or is under common control with, such specific Person. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to control another Person if it (i) has the contractual right to appoint, elect or cause the election of, a majority of the directors, managers or other managing authority, or (ii) beneficially owns, directly or indirectly, at least a majority of the outstanding equity securities or other ownership interests entitled to vote for the election of, or appoint, directors, managers or other managing authority.

"Affiliated Entity" shall mean any Entity which directly or indirectly controls, is controlled by, or is under common control with, another Entity. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an Entity, whether through ownership of voting securities, by contract or otherwise. Without limiting the foregoing, an individual or Entity shall be deemed to control another Entity if it (i) has the contractual

EXHIBIT 1

right to appoint, elect or cause the election of, a majority of the directors, managers or other managing authority, or (ii) beneficially owns, directly or indirectly, at least fifty percent (50%) of the outstanding equity securities or other ownership interests entitled to vote for the election of, or appoint, directors, managers or other managing authority.

"<u>Agreement</u>" shall mean this Agreement, together with any addenda and amendments made in the manner described in this Agreement from time to time.

"<u>Allocation Notice</u>" shall mean Notification of the allocation of the Remaining Termination Shares among the Non-Termination Common Shareholders electing to acquire the Remaining Termination Shares.

"<u>AST</u>" shall have the meaning set forth in Section 15.

"<u>AT&T</u>" shall mean AT&T Inc. or its subsidiaries.

"<u>AT&T Nominee</u>" shall have the meaning set forth in Section 13(d).

"<u>Board</u>" shall mean the Board of Directors of the Corporation.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday and any day on which the Federal Reserve Bank of Dallas is closed.

"<u>Buy-Sell Insurance Proceeds</u>" shall mean the proceeds from any insurance policy, the purpose of which is to purchase shares of the deceased Shareholder, including, without limitation, buy-sell insurance policies and life insurance policies, payable to the MBE Group, directly or indirectly, upon the death of a Shareholder for such purposes.

"<u>Commission</u>" shall mean the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act.

"<u>Common Shareholders</u>" shall mean Shareholders only with regard to the Common Shares owned by such Shareholders.

"<u>Common Shares</u>" shall mean shares of Common Stock.

"<u>Common Stock</u>" shall mean the common stock, $0.0001 par value, of the Corporation and any common stock of the Corporation issued in connection with a recapitalization, reclassification, exchange or change in par value of the Corporation's common stock.

"<u>Common Stock Equivalent</u>" shall mean the right to acquire, whether or not immediately exercisable, any Common Stock from the Corporation, whether evidenced by an option, warrant, convertible security or any other instrument, agreement or arrangement, but excluding pre-emptive rights.

"<u>Competitor</u>" shall mean a Person that is currently, or to the knowledge of the Board has taken reasonable steps to be, in the business of providing any of the following services: (i) onsite installation, upgrade or maintenance of satellite television systems, digital cable television, high speed internet, video surveillance, home security, home and business Internet of Things solutions, commercial audio/video solutions, digital media solutions, or related activities; (ii) outside plant engineering or design, engineering, construction, installation, deployment, or maintenance of wireless, small cell, DAS or wireline networks; and (iii) any material line of business into which the Corporation or its Subsidiaries

enter as determined by the Board of Directors in good faith; provided, however, that Genesis Networks Enterprises, LLC and its Affiliated Entities shall not be deemed to be a Competitor (at which time this definition shall be amended to reflect such line of business by posting the revised definition to the Secure Website); provided further, however, that private investors, money managers and registered Investment Advisers shall not be deemed to be a Competitor unless they control, are controlled by, or are under common control with, a Competitor. Holders of, and prospective investors in, the Notes, Common Stock and Preferred Stock are entitled to rely on a list of Competitors maintained and published by the Corporation on its Secure Website (the "List of Competitors"). The List of Competitors may be modified from time to time by the Board of Directors. The initial List of Competitors is set forth on Schedule B hereto.

"Corporation" shall have the meaning set forth in the Preamble.

"Director Breaching Shareholder" shall have the meaning set forth in Section 13(h).

"Disposition" shall mean any sale or transfer, whether or not outright or as security, inter vivos or testamentary, with or without consideration, voluntary or involuntary, of all or any part of any right, title or interest (including but not limited to voting rights) in or to any Shares. An involuntary encumbrance (including an involuntary pledge) of such Shares shall constitute an Involuntary Disposition under Section 4 when such shares are involuntarily pledged or encumbered.

"Dividend Shares" shall have the meaning set forth in Section 15.

"Drag-Along Shares" shall mean the number of Common Shares equal to the product of (i) the number of Common Shares owned of record by an Other Shareholder multiplied by (ii) a fraction, the numerator of which is the number of Drag Shares such Transferring Shareholder proposes to sell or otherwise dispose of to the Drag Transferee(s), and the denominator of which is the total number of outstanding Common Shares owned by the Transferring Shareholder prior to the proposed Disposition of Drag Shares.

"Drag Notice" shall mean a Notification which shall describe fully: (i) the terms of the proposed Disposition; (ii) the number of Drag Shares of the Transferring Shareholder to be disposed of; (iii) the number of the Drag-Along Shares of such Other Shareholder; (iv) the name and address of the Drag Transferee(s); and (v) the proposed closing date of the Disposition.

"Drag Shares" shall mean the Common Shares to be transferred by the Transferring Shareholder to a Drag Transferee.

"Drag Transferee(s)" shall mean a party or parties that is not the Corporation or a Subsidiary.

"Entity" shall mean any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability company, joint venture, joint stock association, estate, trust, cooperative, foundation, union, syndicate, league, consortium, coalition, committee, society, firm or other enterprise, association, organization or entity of any nature, other than a governmental authority.

"Escrow Agreement" shall have the meaning set forth in Section 15.

"Excepted Securities" shall mean (i) Shares (or options therefor) issued, granted or sold to directors or employees of, or consultants to, the Corporation under any bona fide stock option or equity incentive plan approved by the Board of Directors, (ii) Shares issued by the Corporation in a bona fide underwritten public offering registered under the Securities Act, (iii) securities issued pursuant to the

conversion or exercise of convertible or exercisable securities, (iv) securities issued as dividends on any Shares or (v) securities issued in connection with a stock split or stock dividend or pursuant to a reverse stock split or stock combination, provided that such reverse stock split or stock combination does not have a material effect on the proportionate interests of the Shareholders.

"<u>Extended Preemptive Period</u>" shall have the meaning set forth in Section 3(b).

"<u>Fair Market Value</u>" shall mean, as of a particular date, so long as there has been at least one trade reported on one of the markets set forth below during any of the thirty (30) trading days immediately prior to the particular date, the weighted average price of a Common Share or a Preferred Share, as applicable, based on the mean between the closing bid and asked price on each trading day as reported on one of the markets of the OTC Market Groups (OTCQX, OTCQB or PINK) or similar markets such as the Gray Market.  However, if there is not at least one trade reported on one of the markets set forth below during any of the thirty (30) trading days immediately prior to the particular date, Fair Market Value shall mean (i) for purchases by the MBE Group pursuant to Sections 4 or 7, the per share value of a share of the Common Stock or Preferred Stock, as applicable, on a fully diluted basis, without minority discount or discount due to a voting proxy, determined in the good faith and reasonable judgment of the MBE Group, (ii)  for purchases by the Corporation or its shareholders (other than the MBE Group) pursuant to Sections 4 or 7, the per share value of a share of the Common Stock or Preferred Stock, as applicable, on a fully diluted basis, without minority discount or discount due to a voting proxy, determined in the good faith and reasonable judgment of the Board and (iii) for Section 6, the per share value of a share of the Common Stock on a fully diluted basis, without minority discount or discount due to a voting proxy, determined in the good faith and reasonable judgment of majority of the Whole Board.

"<u>Fifth Amended and Restated Agreement</u>" shall have the meaning set forth in the Recitals.

"<u>Goodman Nominees</u>" shall have the meaning set forth in Section 13(b).

"<u>Goodman Shareholder(s)</u>" shall mean any or all of the following individuals: James E. Goodman, John A. Goodman, Jonathan E. Goodman, Joseph M. Goodman and/or Jason A. Goodman.

"<u>Immediate Family Members</u>" shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of a Shareholder and shall include adoptive relationships and shall include any trust for the sole benefit of any or all of such Immediate Family Members or any partnership, limited liability company or corporation in which Immediate Family Members of a Shareholder own or possess all of the voting and equity interests of such partnership, limited liability company or corporation.

"<u>Indenture</u>" shall mean the Indenture dated as of May 31, 2017, by and among the Corporation, UMB Bank, National Association, as Trustee, and U.S. Bank National Association, as Collateral Agent, governing the Corporation's 8.000% Senior Secured Notes Due 2022.

"<u>Ineligible Disposition</u>" shall mean (i) any Disposition to a Competitor of the Corporation or an Affiliate of a Competitor of the Corporation, (ii) any Disposition the result of which would require the Corporation to register any of its Shares with the Commission, (iii) any Disposition not in compliance with United States federal or state securities laws, (iv) any Disposition in which the transferee does not agree to be bound by the Agreement, and if the transferee is an individual and has a spouse, any Disposition in which the transferee's spouse does not agree to be bound by the Agreement and (v) any Disposition after either Section 4 or Section 7 is triggered and before the Section 4 or Section 7 process, as applicable, is competed or the applicable time periods to take action to purchase Shares has elapsed under Section 4 or Section 7, as applicable.  In addition, with regard to the MBE Group, an Ineligible

Disposition shall include a Disposition by the MBE Group if such Disposition would result in the Corporation no longer qualifying as a minority-controlled business or a minority business with the National Minority Supplier Development Council.

"Information" shall mean all information received from or on behalf of the Corporation and any of its Subsidiaries relating to the Corporation or any of its Subsidiaries or any of their respective businesses, other than any such information that is publicly available, or was known to such Shareholder from a sources other than the Corporation or its Subsidiaries, prior to disclosure by or on behalf of the Corporation or any of its Subsidiaries other than as a result of a breach of Section 8(e).

"Initial Preemptive Period" shall have the meaning set forth in Section 3(a).

"Involuntary Disposition" shall mean a Disposition of Shares owned by a Shareholder occurring as a result of an involuntary encumbrance or transfer, whether by reason of death, divorce, foreclosure, transfer in lieu of foreclosure, operation of law, judicial process or otherwise.

"Involuntary Disposition Notice" shall mean written Notification of (i) the Involuntary Disposition, (ii) the number of Involuntary Disposition Shares, and (iii) all other terms of the Involuntary Disposition.

"Involuntary Disposition Shares" shall mean the Shares transferred or to be transferred, as a result of an Involuntary Disposition, to the Person or Entity that is not the Corporation.

"Involuntary Transferee(s)" shall mean any Person(s) who (i) receive(s) Shares of a Shareholder as a result of such Shareholder's divorce, (ii) as a result of an Involuntary Disposition, hold(s) Shares for a Shareholder as a representative of such Shareholder's estate in the case of such Shareholder's death, or (iii) possess(es) Shares of a Shareholder as a result of any other Involuntary Disposition.

"MBE Group" shall mean Goodman MBE Group LP, a Texas limited partnership which as of the date of this Agreement is owned and controlled by the Goodman Shareholders and shall cause the Corporation to maintain its status as a minority-controlled business or a minority business with the National Minority Supplier Development Council (or any successor organization).

"Nominee(s)" shall mean the Goodman Nominees, the Noteholder Nominees and the AT&T Nominee.

"Non-Tag Disposition" shall mean any of the following:

(a)    any Disposition by a Shareholder to the Corporation or its Subsidiary;

(b)    any Disposition to the MBE Group, any Goodman Shareholder or any of their Affiliated Entities;

(c)    any Disposition by a Shareholder to an Immediate Family Member of such Shareholder or an Affiliated Entity of such Shareholder, including through a will or trust or pursuant to the laws of intestacy, subject to the MBE Group having to use any Buy-Sell Insurance Proceeds, to the extent applicable to the Common Shares subject to the Disposition by the Shareholder, to cover a portion of the purchase price and the recipient of the Shares upon the Disposition having to sell such Shares to the MBE Group having the Buy-Sell Insurance Proceeds using the price and payment provisions set forth in Section 4(e) as if the MBE Group were buying Involuntary Disposition Shares;

(d)    any Disposition by a Shareholder in accordance with such Shareholder's employment or consulting agreement with the Corporation, subject to the MBE Group being the sole permitted purchaser of such Common Shares if the Shareholder is a Goodman Shareholder and if the Corporation is the purchaser, in accordance with the Certificate of Formation of the Corporation;

(e)    any Disposition by a Shareholder that is an Entity to one or more of its beneficial owners, provided that such beneficial owner was already a Shareholder prior to the Disposition;

(f)    any Disposition by a Shareholder that is a trust to a settlor, trustee or beneficiary of the trust, provided that such settlor, trustee or beneficiary was already a Shareholder prior to the Disposition; and

(g)    any Disposition by a Shareholder to a trust, the primary beneficiaries of which are that Shareholder and/or one or more Immediate Family Members of the Shareholder, and under which all voting rights with respect to any Shares must be exercised only by the Shareholder or an Immediate Family Member of the Shareholder.

"Non-Termination Common Shareholders" shall mean the Shareholders of Common Stock other than the Terminated Shareholder.

"Noteholder Nominees" shall have the meaning set forth in Section 13(c).

"Noteholders" shall mean the holders of the Notes.

"Notes" shall mean the $112.5 million 8.000% Senior Secured Notes due 2022.

"Notification" shall mean a writing containing any information required by this Agreement to be communicated to any Person, which may be personally delivered, sent by registered or certified mail, postage prepaid, sent by overnight currier, or sent by facsimile transmission promptly confirmed by mail, to such Person, at the last known address of such Person on the Corporation records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the third Business Day after the date on which it is deposited in a regularly maintained receptacle for the deposit of United States registered mail, addressed, prepaid and sent as aforesaid, in the case of mail, (iii) one Business Day after being sent by professional or overnight courier, with all charges prepaid or (iv) on the day of receipt by the addressee, in the case of facsimile transmission, if such day is a Business Day and the transmission is received before 5:00 p.m. (recipient time) on such Business Day, or if such day is not a Business Day or if such day is a Business Day and the transmission is received after 5:00 p.m. (recipient time), then on the next Business Day.

"Offered Securities" shall have the meaning set forth in Section 3(a).

"Other Common Shareholder(s)" shall have the meaning set forth in Section 4(a).

"Other Shareholder(s)" shall mean, individually and collectively, the Shareholders other than the Transferring Shareholder.

"Person(s)" shall mean any individual or Entity, whether or not a party to this Agreement.

"Plan" shall have the meaning set forth in the Recitals.

"Power to Vote" shall mean the power or right, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, to vote, or to direct the voting of, a Common Share.

"Preemptive Offer" shall have the meaning set forth in Section 3(a).

"Preferred Shareholder" shall mean a holder of Preferred Stock.

"Preferred Shares" shall mean shares of Preferred Stock.

"Preferred Stock" shall mean the Series A-1 Preferred Stock, Series A-2 Preferred Stock and Series A-3 Preferred Stock, $0.0001 par value, of the Corporation and any preferred stock of the Corporation issued in connection with a recapitalization, reclassification, exchange or change in par value of the Corporation's preferred stock relating to the Series A-1 Preferred Stock, Series A-2 Preferred Stock and/or Series A-3 Preferred Stock.

"Proportionate Percentage" shall mean, with respect to any Common Shareholder, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock held by such Common Shareholder and the denominator of which is the total number of shares of Common Stock issued and outstanding at the time of determination that are held by all Common Shareholders.

"Public Offering" shall mean one or a series of firmly underwritten public offerings of Common Stock or Preferred Stock by the Corporation pursuant to registration statements filed by the Corporation with the Commission where the net proceeds to the Corporation from such public offerings shall be not less than an aggregate of Fifty Million United States Dollars (US$50,000,000).

"Refused Securities" shall have the meaning set forth in Section 3(c).

"Reincorporation Breaching Shareholder" shall have the meaning set forth in Section 14(b).

"Remaining Goodman Involuntary Disposition Shares" shall mean the Involuntary Disposition Shares the MBE Group does not elect to acquire pursuant to its right set forth in Section 4(c).

"Remaining Involuntary Disposition Shares" shall mean the Involuntary Disposition Shares the Corporation does not elect to acquire pursuant to its right set forth in Section 4(e).

"Remaining Termination Shares" shall mean the Termination Shares with respect to which the Corporation does not elect to acquire pursuant to its right set forth in Section 7.

"Required Goodman Holders" shall have the meaning set forth in Section 13(b).

"Required Noteholders" shall have the meaning set forth in Section 13(c).

"Secure Website" shall have the meaning set forth in Section 8(a).

"Securities Act" shall mean the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Shareholders" shall mean each party to this Agreement other than the Corporation, each successor and permitted assign of such party who becomes bound by the provisions of this Agreement pursuant to its terms and each holder of Shares, including an Involuntary Transferee who retains any Shares after the provisions of Section 4 have been complied with, that is subject to this Agreement.

"Shares" shall mean all shares the capital stock of the Corporation, including without limitation the Common Stock and Preferred Stock.

"Subsidiary" shall mean any Affiliated Entity of the Corporation (including any organizational predecessors of such Affiliated Entity) of which securities or other ownership interests having ordinary voting power to elect a majority of the directors, managers or other managing authority are directly or indirectly owned by the Corporation.

"Tag Acceptance Notice" shall mean a Notification by an Other Shareholder of that class electing to make a Disposition of such Other Shareholder's Tag Along Portion of the Tag Shares of that class to the transferee(s), stating the number representing the maximum number of such Other Shareholder's Tag Along Portion of the Tag Shares of that class that such Other Shareholder is willing to make subject to the Disposition to the transferee(s).

"Tag Along Portion(s)" shall mean the proportion, as determined on the date the Tag Notice is given, the percentage of Shares of that class held by such Other Shareholder (on an as converted basis into Common Stock, if applicable) bears to the percentage of Shares of that class owned by all the Shareholders (on an as converted basis into Common Stock, if applicable); provided, that, if not all the Other Shareholders elect to transfer such Other Shareholders' Tag Along Portions of the Tag Shares of that class, the Tag Along Portion(s) of the electing Other Shareholders of that class shall increase in number to mean the proportion, as determined on the date the Tag Notice is given, the percentage of Shares of that class held by such Other Shareholder (on an as converted basis into Common Stock, if applicable) bears to the percentage of Shares of that class owned by the Transferring Shareholder and all electing Other Shareholders (on an as converted basis into Common Stock, if applicable).

"Tag Notice" shall mean a Notification which shall describe fully: (i) the terms of the proposed Disposition; (ii) the number and class of Tag Shares of the Transferring Shareholder to be disposed of; (iii) the number representing the Tag Along Portions of the Tag Shares of the Other Shareholder should all Other Shareholders elect to exercise their tag along rights provided in Section 5; (iv) the number representing the Tag Along Portions of the Tag Shares of the Other Shareholder should such Other Shareholder be the only Other Shareholder to exercise the tag along rights provided in Section 5; (v) the name and address of the transferee(s); and (vi) the proposed closing date of the Disposition.

"Tag Shares" shall mean the Shares of a specific class (i.e., Common Shares and shares of Series A-1 Preferred Stock, Series A-2 Preferred Stock and Series A-3 Preferred Stock all being separate classes) to be transferred by the Transferring Shareholder to a transferee.

"Terminated Shareholder" shall mean the Shareholder whose employment or consulting arrangement with the Corporation has been terminated with the result that such Shareholder no longer is employed by or in a consulting arrangement with the Corporation and the Termination Right of First Refusal is triggered.

"Termination Notice" shall mean Notification of the termination of a Shareholder's employment or consulting arrangement with the Corporation which results in such Shareholder no longer being employed by or in a consulting arrangement with the Corporation, which shall state the number of Termination Shares held by such Terminated Shareholder.

"Termination Right of First Refusal" shall mean the rights of the MBE Group pursuant to Section 7(c) or the Corporation and Non-Termination Common Shareholders, pursuant to Section 7(d) and Section 7(e), respectively, to purchase the Termination Shares.

"Termination Shares" shall mean the vested Shares owned by a Terminated Shareholder.

"Total Allocation Notice" shall mean Notification of the allocation of the Termination Shares among the Corporation and the Non-Termination Common Shareholders.

"Transferring Shareholder(s)" shall mean, collectively, one or more Shareholder(s) who are making; or intend to make, a Disposition of Shares (including an Involuntary Disposition) to any Person(s).

"Underlying Shares" shall have the meaning set forth in Section 15.

"Whole Board" shall mean the total number of authorized directors of the Corporation whether or not there exist any vacancies in previously authorized directorships.  For so long as there are any Notes or Preferred Stock outstanding, the number of authorized directors of the Corporation shall consist of five (5) directors.

2.      Restrictions Upon Disposition of Shares by a Shareholder; Provisions Applicable to Transferees.  Any Disposition of Shares must be made in compliance with the terms of this Agreement, and specifically, no Disposition shall be made if it would result in an Ineligible Disposition.  In connection with this restriction, the MBE Group will provide the Board with written notice of any pledges of Shares the MBE Group makes and no foreclosure on any Shares owned by the MBE Group which are pledged will be permitted if such foreclosure would result in the Corporation no longer qualifying as a minority-controlled business or a minority business with the National Minority Supplier Development Council.  In addition, the MBE Group shall cause the Corporation to maintain its status as a minority-controlled business or a minority business with the National Minority Supplier Development Council. Any Disposition by a Shareholder that is not permitted by this Agreement shall be null and void ab initio. Any Shares subject to a Disposition by a Shareholder shall continue to be subject to the provisions of this Agreement.   Any permitted transferee shall be considered to be a Shareholder for purposes of this Agreement and shall have the same rights and obligations as the Transferring Shareholder possessed with regard to the Shares transferred by the Transferring Shareholder pursuant to this Agreement prior to such Disposition.

3.      Preemptive Rights For New Securities.

(a)      Except in the case of Excepted Securities and subject to Section 3(e), the Corporation shall not issue, sell or exchange, agree to issue, sell or exchange, or reserve or set aside for issuance, sale or exchange (i) any equity security of the Corporation, (ii) any debt security of the Corporation which by its terms is convertible into or exchangeable for any equity security of the Corporation, or (iii) any option, warrant or other right to subscribe for, purchase or otherwise acquire any equity security or any debt security referred to in clause (i) or (ii) above, unless in each case the Corporation shall have first offered (the "Preemptive Offer") to sell such securities to the Common Shareholders (the "Offered Securities") by delivery to each Common Shareholder of written notice of such offer stating that the Corporation proposes to sell such Offered Securities, the number or amount of the Offered Securities proposed to be sold, the proposed purchase price therefor and any other terms and conditions of such offer.  The Preemptive Offer shall by its terms remain open and irrevocable for a period of twenty (20) days from the date it is delivered by the Corporation (the "Initial Preemptive Period").  Offered Securities shall not include any phantom shares, cash-settled securities or other similar contractual rights that are related to the price of Shares but do not have any actual rights of Shares.

(b)      Each Common Shareholder shall have the option, exercisable at any time during the Preemptive Period by delivering written notice to the Corporation (each, an "Acceptance Notice" and

collectively, the "Acceptance Notices"), to subscribe for the number or amount of such Offered Securities up to its Proportionate Percentage of the total number or amount of Offered Securities proposed to be issued.  In the event that a Common Shareholder does not elect to purchase its Proportionate Percentage, each Common Shareholder that does elect to purchase its Proportionate Percentage may acquire up to such holder's pro rata portion of the Offer Securities in excess of such holder's Proportionate Percentage (based upon the ratio of the number of shares of Common Stock owned by such purchasing Common Shareholder to the number of shares of Common Stock owned by all purchasing Common Shareholders who desire to purchase more that their Proportionate Percentage). This method of allocation shall continue to apply to rights to acquire all of the Offered Securities until all Offered Securities have been purchased by Common Shareholders, or until the Common Shareholders elect not to purchase any further amount of the Offered Securities.  The allocation of such Offered Securities shall be completed within ten (10) days after the expiration of the Initial Preemptive Period (the "Extended Preemptive Period").  The Corporation shall notify the Common Shareholders within five (5) days following the expiration of the Extended Preemptive Period of the number or amount of Offered Securities which each such Common Shareholder has subscribed to purchase.

(c)    If the Common Shareholders do not deliver Acceptance Notices for all of the Offered Securities, the Corporation shall have ninety (90) days from the expiration of the Initial Preemptive Period or Extended Preemptive Period, as applicable, to sell all or any part of the Offered Securities as to which the Common Shareholders have not subscribed (the "Refused Securities") to any other Persons, but only upon terms and conditions in all respects, including unit price and interest rates, which are no more favorable, in the aggregate, to such other Persons or less favorable to the Corporation than those set forth in the Preemptive Offer. Upon the closing, which shall include full payment to the Corporation, of the sale to such other Persons of all the Refused Securities, the Common Shareholders who provide an Acceptance Notice shall purchase from the Corporation, and the Corporation shall sell to such holders of Common Stock, the Offered Securities, if any, with respect to which Acceptance Notices were delivered, at the terms specified in the Preemptive Offer (with all such sales and purchases occurring simultaneously). In each case, any Offered Securities not purchased by the Common Shareholders or any other Persons in accordance with this Section 3 may not be sold or otherwise disposed of until they are again offered to the Common Shareholders under the procedures specified in this Section 3.

(d)    If any Offered Securities are not purchased by the Common Shareholders or any other Persons in accordance with this Section 3, the Corporation's right to issue, sell or exchange, or reserve or set aside for issuance, sale or exchange such Offered Securities shall expire. In such event, the restrictions of this Section 3 shall be reinstated, and any subsequent issuance, sale or exchange of Offered Securities, whether or not to the same Persons, must be made strictly in compliance with the provisions of this Section 3.

(e)    No sale of the Offered Securities shall result in the Corporation no longer qualifying as a minority-controlled business or a minority business with the National Minority Supplier Development Council.

4.    Involuntary Dispositions by a Shareholder.

(a)    Transfers and Events.  During the term of this Agreement, if an Involuntary Disposition of Involuntary Disposition Shares is made or proposed, the Transferring Shareholder or the Involuntary Transferee if the Transferring Shareholder has died shall immediately give the Involuntary Disposition Notice to the Corporation. Upon the giving of such Involuntary Disposition Notice, the MBE Group, the Corporation and/or the Other Shareholders who own Common Shares ("Other Common Shareholders") shall have the right to acquire, individually or in the aggregate, the Involuntary

Disposition Shares in the manner specified in this Section 4. Any Disposition by a Shareholder under this Section 4 that is an Ineligible Disposition shall be null and void ab initio.

(b) <u>Divorce</u>. If any Involuntary Disposition of the Involuntary Disposition Shares occurs by reason of or in connection with the divorce of the Transferring Shareholder, the Transferring Shareholder shall have the right to acquire such Involuntary Disposition Shares from his ex-spouse upon such terms as they may agree upon. If the Transferring Shareholder and his ex-spouse do not reach agreement upon the purchase terms for such Involuntary Disposition Shares within fifteen (15) days after the Involuntary Disposition to his ex-spouse occurs, the Transferring Shareholder shall have the right to acquire such Involuntary Disposition Shares from his ex-spouse at the price determined in accordance with Section 4(g). If for whatever reason the Transferring Shareholder does not acquire ownership and possession of such Involuntary Disposition Shares from his ex-spouse within sixty (60) days of the Involuntary Disposition by reason of divorce, (i) if the Transferring Shareholder is a Goodman Shareholder, the Involuntary Disposition Shares shall be first offered by the Involuntary Transferee to the MBE Group and then the Corporation in accordance with Sections 4(c) and 4(d) and (ii) if the Transferring Shareholders is not a Goodman Shareholder, the Involuntary Disposition Shares shall be first offered by the Involuntary Transferee to the Corporation and then the Other Common Shareholders in accordance with Sections 4(e) and 4(f).

(c) <u>The MBE Group's Rights to Purchase Involuntary Disposition Shares of a Goodman Shareholder</u>. Subject to Section 4(b), upon an Involuntary Disposition, the MBE Group shall have the first right to acquire all or any portion of the Involuntary Disposition Shares from a Transferring Shareholder or Involuntary Transferee, as appropriate, relating to Shares of the Goodman Shareholder. If the MBE Group desires to acquire all or any portion of the Involuntary Disposition Shares, the MBE Group shall communicate, in writing, its election to purchase all or any portion of the Involuntary Disposition Shares to the Corporation (i) if Section 4(b) does not apply, within thirty (30) days after the date the Involuntary Disposition Notice was given to the Corporation or (ii) if Section 4(b) applies, within thirty (30) days after the later of (A) the expiration of the sixty (60) day period in Section 4(b) or (B) the expiration of sixty (60) days after the date the Involuntary Disposition Notice was delivered to the Corporation. Such communication shall, when taken in conjunction with the Involuntary Disposition Notice, be deemed to constitute a valid, legally binding, and enforceable agreement for the Disposition of all or that portion of the Involuntary Disposition Shares.

(d) <u>The Corporation's Rights to Purchase Involuntary Disposition Shares of a Goodman Shareholder</u>. If the MBE Group does not exercise its right to acquire all of the Involuntary Disposition Shares under Section 4(c), the Corporation shall have the right to acquire all or any portion of the Remaining Goodman Involuntary Disposition Shares. The Corporation shall exercise its right to acquire by giving written notice of its election to acquire a specified number of the Remaining Goodman Involuntary Disposition Shares to the Corporation within twenty (20) days after the expiration of the applicable thirty (30) day period in Section 4(c). Promptly after the allocation of the Remaining Goodman Involuntary Disposition Shares among the MBE Group and the Corporation, the Corporation shall communicate, in writing, the allocation of the Involuntary Disposition Shares among the MBE Group and the Corporation to the Transferring Shareholder or Involuntary Transferee, as appropriate. Such communication shall, when taken in conjunction with the Involuntary Disposition Notice, be deemed to constitute a valid, legally binding and enforceable agreement for the Disposition of all or that portion of the Involuntary Disposition Shares that the MBE Group and the Corporation has so elected to acquire, subject to the remainder of this paragraph. The obligations of the MBE Group and the Corporation to acquire the number of Involuntary Disposition Shares specified in the notice sent to the Transferring Shareholder are the several, and not joint, obligations of such parties.

(e)    <u>The Corporation's Rights to Purchase Involuntary Disposition Shares Not Relating to a Goodman Shareholder</u>.  Subject to Section 4(b), upon an Involuntary Disposition, the Corporation shall have the first right to acquire all or any portion of the Involuntary Disposition Shares from a Transferring Shareholder or Involuntary Transferee, as appropriate, of Shares not relating to the Goodman Shareholder. If the Corporation desires to acquire all or any portion of the Involuntary Disposition Shares, the Corporation shall communicate, in writing, its election to purchase all or any portion of the Involuntary Disposition Shares to the Other Common Shareholders (i) if Section 4(b) does not apply, within thirty (30) days after the date the Involuntary Disposition Notice was given to the Corporation or (ii) if Section 4(b) applies, within thirty (30) days after the later of (A) the expiration of the sixty (60) day period in Section 4(b) or (B) the expiration of sixty (60) days after the date the Involuntary Disposition Notice was delivered to the Corporation. Such communication shall, when taken in conjunction with the Involuntary Disposition Notice, be deemed to constitute a valid, legally binding, and enforceable agreement for the Disposition of all or that portion of the Involuntary Disposition Shares.

(f)    <u>The Other Common Shareholders' Rights to Purchase Involuntary Disposition Shares Not Relating to a Goodman Shareholder</u>.  If the Corporation does not exercise its right to acquire all of the Involuntary Disposition Shares under Section 4(e), the Other Common Shareholders shall have the right to acquire all or any portion of the Remaining Involuntary Disposition Shares. The Other Common Shareholders shall exercise their right to acquire by giving written notice of their election to acquire a specified number of the Remaining Involuntary Disposition Shares to each Other Common Shareholder and the Corporation within twenty (20) days after the expiration of the applicable thirty (30) day period in Section 4(e). In the event that more than one Other Common Shareholder exercises his or her right to acquire the Remaining Involuntary Disposition Shares pursuant to this Section 4(f), each such exercising Other Common Shareholder may acquire up to his or her pro rata portion of the Remaining Involuntary Disposition Shares (based upon the ratio of the number of shares of Common Stock owned by such exercising Other Common Shareholder to the number of shares of Common Stock owned by all exercising Other Common Shareholders). This method of allocation shall continue to apply to rights to acquire all of the Remaining Involuntary Disposition Shares until all options have been exercised by one or more Other Common Shareholders (which exercises shall constitute valid, legally binding and enforceable agreements for the Disposition of the Remaining Involuntary Disposition Shares allocated to such Other Common Shareholders), or until the remaining Other Common Shareholders elect not to exercise their rights to acquire any additional Remaining Involuntary Disposition Shares. The allocation of such Remaining Involuntary Disposition Shares among the Other Shareholders shall be completed within ten (10) days after the expiration of the twenty (20) day period referred to above in this Section 4(f). Promptly after the allocation of the Remaining Involuntary Disposition Shares among the Other Common Shareholders, the Corporation shall communicate, in writing, the allocation of the Involuntary Disposition Shares among the Corporation and the Other Common Shareholders to the Transferring Shareholder or Involuntary Transferee, as appropriate. Such communication shall, when taken in conjunction with the Involuntary Disposition Notice, be deemed to constitute a valid, legally binding and enforceable agreement for the Disposition of all or that portion of the Involuntary Disposition Shares that the Corporation and the Other Common Shareholder has so elected to acquire, subject to the remainder of this paragraph. The obligations of the Corporation and the Other Common Shareholders to acquire the number of Involuntary Disposition Shares specified in the notice sent to the Transferring Shareholder are the several, and not joint, obligations of such parties.

(g)    <u>Purchase Price</u>.  If no consideration is given by a transferee in connection with the Involuntary Disposition of the Involuntary Disposition Shares, the purchase price per share shall be the Fair Market Value as of the date of the Involuntary Disposition Notice, or with regard to an Involuntary Disposition pursuant to Section 4(b), the date of the Involuntary Disposition. If consideration is given by a transferee in connection with the Involuntary Disposition of the Involuntary Disposition Shares, the purchase price per Share for such Involuntary Disposition Shares shall be the lesser of (i) the

Fair Market Value as of the date of the Involuntary Disposition Notice, or with regard to an Involuntary Disposition pursuant to Section 4(b), the date of the Involuntary Disposition, or (ii) the fair value of the consideration given for such Involuntary Disposition Shares. If the consideration given for such Involuntary Disposition Shares is non-cash consideration and the Transferring Shareholder, the Corporation and the Other Shareholders electing to purchase any or all of the Involuntary Disposition Shares are unable to agree upon the fair value of such non-cash consideration within ten (10) days after the date the Involuntary Disposition Notice was delivered to the Corporation, an appraisal firm jointly selected by the Corporation, the Transferring Shareholder and the Other Common Shareholders electing to purchase any or all of the Involuntary Disposition Shares shall determine the fair value of such non-cash consideration, and the fees and expenses of such appraisal firm shall be borne by the Corporation. Any such determination of the fair value of such non-cash consideration by the appraisal firm shall be conclusive and binding on all parties. During the time an appraisal firm is being jointly selected and the appraisal is being performed, all time periods pursuant to this Section 4(b) shall be tolled until the determination of the fair value of such non-cash consideration by the appraisal firm is released to the Corporation, the Transferring Shareholder and the Other Common Shareholders at which time such time periods shall continue.

(h)  Closing.  The closing of the purchase of the Involuntary Disposition Shares hereunder shall be held at the principal executive offices of the Corporation. The Corporation shall designate a closing date and time, which date shall be not later than (i) ninety (90) days after the date of the Involuntary Disposition Notice if Section 4(b) does not apply to the Involuntary Disposition, or (ii) one hundred fifty (150) days after the date of the Involuntary Disposition Notice if Section 4(b) applies to the Involuntary Disposition. At the closing, the Transferring Shareholder or the Involuntary Transferee, as appropriate, shall deliver certificates duly endorsed or accompanied by duly executed stock powers for the Involuntary Disposition Shares being acquired pursuant to this Section 4 and shall transfer the Involuntary Disposition Shares being acquired pursuant to this Section 4 to the purchasers thereof, free and clear of all liens, claims, charges or encumbrances (except for liens in favor of the Corporation), against payment of the purchase price for the Involuntary Disposition Shares as determined above. The purchaser shall have the option to pay the purchase price in cash at the time of such closing or (i) to pay no less than ten percent (10%) of the purchase price in cash and (ii) execute a negotiable promissory note (secured by the purchased Involuntary Disposition Shares of such purchaser to the extent possible) for the remainder in favor of the Transferring Shareholder or the Involuntary Transferee, as appropriate, which note shall be payable in quarterly installments over a period of five (5) years and which shall bear annual interest at the rate of eight percent (8%). However, if the MBE Group shall be the purchaser of the Involuntary Disposition Shares and there are Buy-Sell Insurance Proceeds applicable to the Involuntary Disposition Shares, then the MBE Group shall have the option to pay the purchase price in cash at the time of such closing, using the Buy-Sell Insurance Proceeds as a portion of the purchase price, or (i) pay the greater of (A) at least ten percent (10%) of the purchase price or (B) all of the Buy-Sell Insurance Proceeds in cash and (ii) execute a negotiable promissory note (secured by the purchased Involuntary Disposition Shares of such purchaser to the extent possible) for the remainder in favor of the Involuntary Transferee, as appropriate, which note shall be payable in quarterly installments over a period of five (5) years and which shall bear annual interest at the rate of eight percent (8%). If the Corporation shall be the purchaser of the Involuntary Disposition Shares, the Corporation shall have the right to set off against any payment for such Involuntary Disposition Shares the amount by which the Transferring Shareholder shall be indebted to the Corporation (including accrued but unpaid interest on such indebtedness) pursuant to any promissory note given by the Transferring Shareholder for the purchase of any Involuntary Disposition Shares.

(i)  Involuntary Transferee.  If less than all of the Involuntary Disposition Shares are purchased from the Involuntary Transferee pursuant to this Section 4, the Involuntary Transferee shall execute a written agreement that such Involuntary Transferee will be bound by, and the Shares that such

Involuntary Transferee holds will be subject to, this Agreement as provided herein, and after such execution, the Involuntary Transferee shall be classified as a Shareholder.

5.      Tag-Along Rights.  In the event that (i) a Transferring Shareholder proposes to make a Disposition (other than a Non-Tag Disposition or other than a Disposition pursuant to Sections 4 or 7) for value of more than twenty-five percent (25%) of the total number of Shares of a class outstanding, in one transaction or a series of related transactions and (ii) such Transferring Shareholder has not exercised its drag-along rights pursuant to Section 6, if applicable, such Transferring Shareholder shall require the transferee(s), as a condition precedent to the consummation of the Disposition of the Tag Shares to such transferee(s), to offer to acquire from each of the Other Shareholders of the Tag Shares class, on the same terms and conditions as the proposed Disposition from such Transferring Shareholder, such Other Shareholders' Tag-Along Portions of the Tag Shares of that class.

Such a Transferring Shareholder proposing to make a Disposition of the Tag Shares shall give the Tag Notice to the Other Shareholders of that class. It shall be a condition to the consummation of a Disposition covered by this Section 5 that the Tag Notice shall have been signed by such Transferring Shareholder and the transferee(s).  Such signed Tag Notice shall be an irrevocable offer by the transferee(s), open for thirty (30) days after the Tag Notice is given, to acquire as provided above all Tag-Along Portions of the Tag Shares of that class, and each Other Shareholder of that class shall have thirty (30) days after receipt of the Tag Notice to accept or decline such offer as to such Other Shareholder's Tag-Along Portion of the Tag Shares of that class. If any Other Shareholder(s) of that class chooses to accept such offer, such Other Shareholder(s) shall give the Tag Acceptance Notice to such Transferring Shareholder and transferee(s) within such thirty (30) day period, and the amount of such Transferring Shareholder's Shares subject to the proposed Disposition shall be reduced by each electing Other Shareholder's Tag-Along Portion of the Tag Shares of that class. Such Transferring Shareholder shall not consummate the proposed sale or Disposition to the transferee(s) unless (i) the sale of the Tag-Along Portions of the Tag Shares pursuant to the Tag Acceptance Notice of such electing Other Common Shareholders is consummated, (ii) the Other Shareholders of that class waive their tag along rights as to the Tag-Along Portions of the Tag Shares or (iii) the irrevocable offer expires without acceptance by any Other Shareholder of that class during the thirty (30) day period.  If any of the Other Shareholders of that class accept the offer, such Transferring Shareholder and the transferee(s) shall keep such Other Shareholder(s) reasonably informed of the progress of the sale proposed in the Tag Notice. Any Other Shareholders that accept the offer shall become a party to any agreement with the Disposition of the Tag Shares providing representations and warranties, indemnification obligations (including escrows, hold back or other similar arrangements to support such indemnity obligations), releases or other obligations to which the Transferring Shareholder or its Affiliates (other than the Corporation) agree in connection with such Disposition (other than any such obligations that relate specifically to a particular Shareholder such as indemnification with respect to representations and warranties given by the Shareholder regarding such Shareholder's title to and ownership of Shares as to which obligations each such Shareholder shall be solely liable). If a Disposition of the Tag Shares pursuant to this Section 5 is not made within ninety (90) days of the Tag Notice, such right to make a Disposition pursuant to this Section 5 shall expire. In such event, the restrictions of this Section 5 shall be reinstated, and any subsequent Disposition of Tag Shares, whether or not to the same transferee, must be made strictly in compliance with the provisions of this Section 5.

Any Disposition by a Shareholder under this Section 5 that is an Ineligible Disposition shall be null and void ab initio.

6.      Drag-Along Rights.  In the event that (i) a Transferring Shareholder proposes to make a Disposition for value to one or more Drag Transferees of more than fifty percent (50%) of the total number of Common Shares outstanding, in one transaction or a series of related transactions, other than a

Disposition made by means of a Public Offering and (ii) in such transaction or series of related transactions, the Preferred Shareholders of all of the issued and outstanding Preferred Shares are paid the aggregate stated value of all of the issued and outstanding Preferred Shares and all accrued and unpaid dividends of all such issued and outstanding Preferred Shares, the Transferring Shareholder shall have the right and option (but not the obligation) to require each Other Common Shareholder to make a Disposition to such Drag Transferee(s) of all of the Drag-Along Shares of such Other Common Shareholder(s). If the Transferring Shareholder elects to require any Other Common Shareholder(s) to make a Disposition to such Drag Transferee of the Drag-Along Shares owned of record by such Other Common Shareholder(s), the Transferring Shareholder shall give the Drag Notice to such Other Common Shareholder(s). It shall be a condition to the consummation of a Disposition covered by this Section 6 that the Drag Notice shall have been signed by the Transferring Shareholder and the Drag Transferee(s). The Transferring Shareholder and the Drag Transferee(s) shall keep the Other Common Shareholder(s) who incur the drag-along obligations set forth in this Section 6 reasonably informed of the progress of the sale proposed in the Drag Notice. The Transferring Shareholder and the Drag Transferee(s) shall keep the Other Common Shareholder(s) subject to the drag-along obligations reasonably informed of the progress of the sale proposed in the Tag Notice. The Other Common Shareholders who incur the drag-along obligations set forth in this Section 6 shall become a party to any agreement with the Disposition of the Drag Shares providing representations and warranties, indemnification obligations (including escrows, hold back or other similar arrangements to support such indemnity obligations), releases or other obligations to which the Transferring Shareholder or its Affiliates (other than the Corporation) agree in connection with such Disposition (other than any such obligations that relate specifically to a particular Shareholder such as indemnification with respect to representations and warranties given by the Shareholder regarding such Shareholder's title to and ownership of Shares as to which obligations each such Shareholder shall be solely liable). If a Disposition of the Drag Shares pursuant to this Section 6 is not made within ninety (90) days of the Drag Notice, such right to make a Disposition pursuant to this Section 6 shall expire. In such event, the restrictions of this Section 6 shall be reinstated, and any subsequent Disposition of Drag Shares, whether or not to the same Drag Transferee, must be made strictly in compliance with the provisions of this Section 6. If the Drag Transferees is not a bona fide third-party purchaser, the price per Share must be at least the Fair Market Value.

Any Disposition by a Shareholder under this Section 6 that is an Ineligible Disposition shall be null and void ab initio.

7.      Right of First Refusal Upon Termination of a Shareholder's Employment or Consulting Agreement.

(a)      Offer to MBE Group, Corporation and/or Other Common Shareholders. If a Shareholder is an employee of the Corporation or in a consulting arrangement with the Corporation and the employment or consulting arrangement of such Shareholder is terminated, whether such termination is voluntary or involuntary or effected by the Corporation or the Shareholder, with the result that such Shareholder is neither an employee of the Corporation nor a consultant of the Corporation, with the exception of the termination of employment or consulting arrangement of a Shareholder because of the death of such Shareholder which is subject to Section 4 hereof, (i) with regard to the termination of employment or consulting arrangement of a Goodman Shareholder, the MBE Group shall have the right, but not the obligation, to purchase all of the Termination Shares in the manner specified in this Section 7 and (ii) with regard to the termination of employment or consulting arrangement of a Common Shareholder other than a Goodman Shareholder, the Corporation and the Non-Termination Common Shareholders shall have the right, but not the obligation, to purchase all of the Termination Shares in the manner specified in this Section 7.

(b)      Notices. The Corporation shall promptly give the Termination Notice to the MBE Group or the Non-Termination Common Shareholders, as applicable.

(c)      The MBE Group's Right of First Refusal.  The MBE Group shall have the right to acquire all or any portion of the Termination Shares of a Goodman Shareholder. If the MBE Group desires to acquire all or any portion of the Termination Shares of a Goodman Shareholder, the MBE Group shall communicate, in writing, its election to acquire a specified number of the Termination Shares to the Corporation within thirty (30) days from the later of (i) the date of termination of the Terminated Shareholder's employment or consulting arrangement with the Corporation or (ii) six (6) months from the last date on which the Terminated Shareholder (x) acquired the Termination Shares or (y) can exercise any vested stock options.

(d)      The Corporation's Right of First Refusal.  The Corporation shall have the first right to acquire all or any portion of the Termination Shares of a non-Goodman Shareholder. If the Corporation desires to acquire all or any portion of the Termination Shares of a non-Goodman Shareholder, the Corporation shall communicate, in writing, its election to acquire a specified number of the Termination Shares to the Non-Termination Common Shareholders within thirty (30) days from the later of (i) the date of termination of the Terminated Shareholder's employment or consulting arrangement with the Corporation or (ii) six (6) months from the last date on which the Terminated Shareholder (x) acquired the Termination Shares or (y) can exercise any vested stock options.

(e)      The Non-Termination Common Shareholders' Right of First Refusal.  If the Corporation does not exercise its right to acquire all of the Termination Shares from the Terminated Shareholder who is not a Goodman Shareholder, the Non-Termination Common Shareholders shall have the right to acquire all of the Remaining Termination Shares of a non-Goodman Shareholder. The Non-Termination Common Shareholders shall exercise their Termination Right of First Refusal by giving written notice of their election to acquire a specified number of the Remaining Termination Shares to each Non-Termination Common Shareholder and the Corporation within twenty (20) days after the expiration of the thirty (30) day period referred to in Section 7(d). In the event that more than one Non-Termination Common Shareholder exercises his right to acquire, each such exercising Non-Termination Common Shareholder may acquire up to his pro rata portion of the Remaining Termination Shares (based upon the ratio of the number of shares of Common Stock and Common Stock Equivalents (on an as converted basis) owned by such exercising Non-Termination Common Shareholder to the number of shares of Common Stock and Common Stock Equivalents (on an as converted basis) owned by all exercising Non-Termination Common Shareholders). This method of allocation shall continue to apply to rights to acquire all of the Remaining Termination Shares until all rights have been exercised by one or more Non-Termination Common Shareholders (which exercises shall constitute valid, legally binding and enforceable agreements for the transfer of the Remaining Termination Shares allocated to such Non-Termination Common Shareholders), or until the remaining Non-Termination Common Shareholders elect not to exercise their rights to acquire any additional Remaining Termination Shares. The allocation of such Remaining Termination Shares among the Non-Termination Common Shareholders shall be completed within ten (10) days after the expiration of the twenty (20) day period referred to above in this Section 7(e). The Non-Termination Common Shareholders shall give the Allocation Notice to the Corporation. If the Non-Termination Common Shareholders do not elect to acquire all of the Remaining Termination Shares, the Corporation will have the right to acquire such Shares the Non-Termination Common Shareholders have elected not to acquire. The Corporation shall give the Total Allocation Notice to the Terminated Shareholder prior to the expiration of sixty-five (65) days from the later of later of (i) the date of termination of the Terminated Shareholder's employment or consulting arrangement with the Corporation or (ii) six (6) months from the last date on which the Terminated Shareholder (x) acquired the Termination Shares or (y) can exercise any vested stock options.  The Allocation Notice and the Total Allocation Notice shall be deemed to constitute a valid, legally binding and enforceable

agreement for the transfer of all or that portion of the Termination Shares. The obligations of the Corporation and the Non-Termination Common Shareholders to acquire the number of Termination Shares specified in the notice sent to the Terminated Shareholder are the several, and not joint, obligations of such parties.

(f)     Purchase Price For Termination.  For Shares owned on the date of termination of the Terminated Shareholder's employment, the purchase price share for the Termination Shares shall be the Fair Market Value on the later of later of (i) the date of termination of the Terminated Shareholder's employment or consulting arrangement with the Corporation or (ii) six (6) months from the last date on which the Terminated Shareholder (x) acquired the Termination Shares or (y) can exercise any vested stock options.

(g)     Closing.  The closing of the purchase of Termination Shares hereunder shall be held at the principal executive offices of the Corporation. The Corporation shall designate a closing date and time, which date shall be not later than ninety (90) days after the later of later of (i) the date of termination of the Terminated Shareholder's employment or consulting arrangement with the Corporation or (ii) six (6) months from the last date on which the Terminated Shareholder (x) acquired the Termination Shares or (y) can exercise any vested stock options.  At the closing, the Terminated Shareholder shall deliver certificates duly endorsed or accompanied by duly executed stock powers for the Termination Shares being acquired pursuant to this Section 7 and shall transfer the Termination Shares being acquired pursuant to this Section 7 to the purchasers thereof free and clear of all liens, claims, charges or encumbrances (except for liens in favor of the Corporation), against payment of the purchase price for the Termination Shares as determined above. The purchaser shall have the option to pay the purchase price in cash at the time of such closing or (i) to pay not less than ten percent (10%) of the purchase price in cash and (ii) execute a negotiable promissory note (secured by the purchased Termination Shares of such purchaser to the extent possible) for the remainder in favor of the Terminated Shareholder which note shall be payable in quarterly installments over a period of five (5) years and which shall bear annual interest at the rate of eight percent (8%).  If the Corporation shall be a purchaser of Termination Shares, the Corporation shall have the right to set off against any payment for such Termination Shares the amount by which the Terminated Shareholder shall be indebted to the Corporation (including accrued but unpaid interest on such indebtedness) pursuant to any promissory note given by the Terminated Shareholder for the purchase of any such Termination Shares.

(h)     No Ineligible Disposition.  Any Disposition by a Shareholder under this Section 7 that is an Ineligible Disposition shall be null and void ab initio.

8.     Access to Reports; Confidentiality.

(a)     Reports.  So long as any of the Common Shares or Preferred Shares are outstanding, the Corporation shall maintain a secure password protected website (the "Secure Website") available to each Shareholder, bona fide prospective purchaser of Shares so long as such prospective purchaser is not a Competitor of the Corporation or an Affiliate of a Competitor of the Corporation, securities analyst and bona fide market maker.  For any bona fide prospective purchaser of Shares to obtain a password, such prospective purchaser must certify to the Corporation that it (i) is a bona fide prospective purchaser of Common Shares or Preferred Shares, (ii) is not a Competitor of the Corporation or an Affiliate of a Competitor of the Corporation and (iii) has agreed to keep the information obtained from the Secure Website confidential.  So long as any Notes are outstanding, the Secure Website will contain the information required to be provided pursuant to Section 4.03 of the Indenture. If there are no Notes outstanding, the Secure Website will not have to provide the information set forth in Section 4.03 of the Indenture and instead shall contain the following information:  (i) audited financial statements of the Corporation on a consolidated basis which will be posted within one hundred twenty (120) days after

the end of the most recent fiscal year and (ii) quarterly financial statements of the Corporation on a consolidated basis which will be posted within forty-five (45) days after the end of the most recent fiscal quarter; provided, however, that the Company will also use its commercially reasonable efforts to hold and participate in quarterly conference calls with Shareholders, bona fide prospective purchasers who are not Competitors of the Corporation or Affiliates of Competitors of the Corporation, securities analysts and market makers to discuss such financial information and any material development with respect to the corporation and its business no later than ten Business Days after distribution of such financial information.

(b)     Confidentiality.     Each Shareholder agrees to maintain as confidential all Information provided or made available to such Shareholder by the Corporation for a period of two (2) years following the receipt thereof, except that such Shareholder may disclose such Information (i) to Affiliates of the specific Shareholder, the present or prospective sources of financing of the specific Shareholder, and the directors, managers, officers, general partners, employees, financial advisors, attorneys and accountants who need to know such Information that have agreed to comply with the covenant contained in this Section 8(b); (ii) in connection with any Disposition or proposed Disposition of Shares and the proposed permitted transferee has agreed to comply with the covenant contained in this Section 8(b); (iii) as requested or required by any governmental authority or reasonably believed by such Shareholder to be completed by any court decree, subpoena or legal or administrative order or process; (iv) as, on the advice of such Shareholder's counsel, is required by law; (v) in connection with the exercise of any right or remedy under this Agreement or in connection with any action, claim, lawsuit, demand, investigation or proceeding to which such Shareholder is a party before any governmental authority or before any arbitrator or panel of arbitrators; or (vi) that becomes publicly available through no fault of such Shareholder or any other Person to whom such Shareholder provided information.  Each Shareholder shall be responsible and liable for any violation of this Section 8(b) by any Person described in clause (i) or (ii) of this Section 8(b).

9.     Failure to Deliver Shares to the Corporation.   If a Shareholder or an Involuntary Transferee becomes obligated to sell any Shares to the Corporation, the MBE Group or the Other Shareholders or Other Common Shareholders under this Agreement and fails to deliver such Shares in accordance with the terms of this Agreement, the Corporation or such Other Shareholders/Other Common Shareholders may, in addition to all other remedies they may have, tender to such Shareholder or Involuntary Transferee, as appropriate, at the last known address with regard to an Involuntary Transferee and at the address set forth in the stock transfer records of the Corporation with regard to Shareholders, the purchase price for such Shares as is herein specified, and (i) in the case of Shares to be sold to the Corporation pursuant to this Agreement, cancel such Shares on its books and records, whereupon all of such Shareholder's or Involuntary Transferee's right, title and interest in and to such Shares shall terminate, and (ii) in the case of Shares to be sold to the MBE Group or an Other Shareholder/Other Common Shareholder under this Agreement, issue certificates representing such Shares to the MBE Group or the Other Shareholder/Other Common Shareholder and register the MBE Group or the Other Shareholder/Other Common Shareholder on the Corporation's books and records as the record owner of the Shares, whereupon all of such Shareholder's or Involuntary Transferee's right, title, and interest in and to such Shares shall terminate.

10.     Death of Shareholder or Involuntary Transferee During Payout.  In the event of the death of the Transferring Shareholder or Involuntary Transferee after payment has commenced hereunder, the terms and amounts of payment shall continue unchanged, payments shall be made to such Transferring Shareholder's or Involuntary Transferee's estate or personal representative.

11.     Holdback Provision.  In the event of a Public Offering, each Shareholder covenants that from the date of such Public Offering until the shorter of (i) one hundred eighty (180) days following the

completion of the Public Offering, or (ii) the period during which the Chief Executive Offer of the Corporation agrees in writing not to offer, sell, transfer or otherwise engage in a Disposition of any Shares following the Public Offering, each Shareholder will not offer, sell, transfer or otherwise engage in a Disposition of any of the Shares owned by such Shareholder, except in connection with a sale, merger, disposition or statutory share exchange approved by the Board of the Corporation or a tender offer for at least fifty percent (50%) of the outstanding shares of Common Stock of the Corporation, without the prior written consent of the managing underwriter and covenants, in connection with the Public Offering, to sign customary lock-up agreements restricting a Disposition of the Shares held by such Shareholder for the shorter of the one hundred eighty (180) days following the consummation of the Public Offering or the lockup period described in clause (ii), such agreements to be on terms substantially similar to those signed, by the Chief Executive Officer of the Corporation.

12.    <u>Legend</u>.  During the term of this Agreement, each certificate or book-entry representing the Shares beneficially owned by the Shareholders shall bear the following legend or language in the book-entry, if applicable, or a similar legend deemed by the Corporation to constitute an appropriate notice of the provisions hereof and the applicable securities laws (any such certificate not having such legend shall be surrendered upon demand by the Corporation and so endorsed):

On the face of the certificate:

TRANSFER OF THIS STOCK IS RESTRICTED IN ACCORDANCE WITH CONDITIONS PRINTED ON THE REVERSE OF THIS CERTIFICATE.

On the reverse:

THE TRANSFER OF THE SHARES REPRESENTED BY THIS STOCK CERTIFICATE/BOOK ENTRY IS SUBJECT TO A CERTAIN SIXTH AMENDED AND RESTATED SHAREHOLDERS' AGREEMENT, AS THE SAME MAY BE AMENDED, RESTATED, SUPPLEMENTED, SUPERSEDED, REPLACED, RENAMED, TERMINATED AND/OR OTHERWISE MODIFIED AT ANY TIME AND FROM TIME TO TIME. A COPY OF THE CURRENT VERSION OF SUCH AGREEMENT, AS AMENDED, IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION AND WILL BE FURNISHED WITHOUT CHARGE TO THE RECORD HOLDER HEREOF UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE.

If the Shares are "Restricted Securities" as defined in Section 144 of the Securities Act, the following legend or language shall also be placed on the certificate or in the book-entry:

THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE/BOOK ENTRY HAVE BEEN ACQUIRED BY THE HOLDER FOR INVESTMENT AND NOT FOR RESALE, TRANSFER OR DISTRIBUTION, HAVE BEEN ISSUED PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF APPLICABLE STATE AND FEDERAL SECURITIES LAWS, AND MAY NOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED OTHER THAN PURSUANT TO EFFECTIVE REGISTRATION UNDER SUCH LAWS, OR IN TRANSACTIONS OTHERWISE IN COMPLIANCE WITH SUCH LAWS, AND UPON EVIDENCE SATISFACTORY TO THE CORPORATION OF COMPLIANCE WITH SUCH LAWS, AS TO WHICH THE CORPORATION MAY RELY UPON AN OPINION OF COUNSEL SATISFACTORY TO THE CORPORATION.

Each Shareholder shall promptly surrender the certificates representing its Shares to the Corporation so that the Corporation may affix the foregoing legends thereto. A copy of this Agreement shall be kept on file in the principal executive offices of the Corporation. Upon termination of all applicable restrictions set forth herein and upon tender to the Corporation of the appropriate stock certificates, the Corporation shall reissue to the holder of such stock certificates new stock certificates which shall contain only the second paragraph of the restrictive legend set forth above, if applicable, or an updated book-entry. The parties to this Agreement intend that the legend conform to the applicable provisions of the Uniform Commercial Code of Texas and the Texas Business Organizations Code. This legend may be modified from time to time by the Board of Directors of the Corporation to conform to such statutes or to this Agreement.

13.    Directors.

(a)    For so long as there are any Notes or Preferred Shares outstanding, the Board shall consist of five (5) directors and each of the Shareholders shall take such action to maintain five (5) Board members as provided herein.

(b)    For so long as there are any Notes or Preferred Shares outstanding, at least two of the Goodman Shareholders who combined, directly or indirectly own or control at least forty and one-tenth percent (40.1%) of the Common Shares (the "Required Goodman Holders") shall have the right to nominate two (2) directors to sit on the Board (the "Goodman Nominees"). Promptly upon the Required Goodman Holders naming the Goodman Nominees, the Corporation and the Common Shareholders shall take any and all action necessary or reasonably requested by the Required Goodman Holders to effect the purposes and intents of the foregoing, including the voting by the Common Shareholders of their Common Shares in favor of the election of the Goodman Nominees.

(c)    For so long as there are any Notes outstanding, the Noteholders shall have the right to nominate two (2) non-employee directors to sit on the Board (the "Noteholder Nominees") pursuant to Section 4.20 of the Indenture. Promptly upon the Noteholders naming the Noteholder Nominees in accordance with the terms of the Indenture, the Corporation and the Common Shareholders shall take any and all action necessary or reasonably requested by the holders of more than fifty percent (50%) of the aggregate principle amount of the Notes (the "Required Noteholders") to effect the purposes and intents of the foregoing, including the voting by the Common Shareholders of their Common Shares in favor of the election of the Noteholder Nominees.

(d)    For so long as there are any Notes or Preferred Shares outstanding, AT&T shall have the right to propose three (3) potential directors and at least two (2) of the Required Goodman Holders shall have the right to nominate one (1) of those three (3) potential directors to sit on the Board (the "AT&T Nominee") within five (5) days of receipt of the AT&T candidates. Promptly upon the Required Goodman Holders naming the AT&T Nominee, the Corporation and the Common Shareholders shall take any and all action necessary or reasonably requested by the Required Goodman Holders to effect the purposes and intents of the foregoing, including the voting by the Common Shareholders of their Common Shares in favor of the election of the AT&T Nominee.

(e)    Each Common Shareholder covenants and agrees (i) to vote (at any regular or special meeting of the Common Shareholders or via written consent) all the Common Shares which such Common Shareholder has the Power to Vote in favor of, or otherwise to consent to, and (ii) to cause the Board to take all actions necessary and appropriate (whether by vote or consent or otherwise) to nominate and cause, the election of the Nominees to the Board. In addition, each Common Shareholder covenants and agrees (i) to vote (at any regular or special meeting of the Common Shareholders or via written consent) all the Common Shares which such Common Shareholder has the Power to Vote to remove, or

otherwise to consent to the removal of, and (ii) to cause the Board to take all actions necessary and appropriate (whether by vote or consent or otherwise) to remove any director pursuant to Sections 13(f) through (g).

(f)     For so long there are any Notes or Preferred Shares outstanding, if, following election to the Board, any Nominee shall be unwilling to serve, resign, be removed by the group that nominated such Nominee or be unable to serve by reason of death or disability, the group that nominated such former Nominee shall be entitled to nominate a replacement who shall then be a Nominee for the purposes of this Agreement, and the Shareholders shall take such steps as may be necessary to elect such replacement Nominee to the Board to fill the unexpired term of the prior Nominee.  If Noteholders have failed to submit any replacement Nominee for the Noteholder director vacancy by the second Nomination Deadline (as defined in the Indenture) for such Noteholder director vacancy, all in accordance with the terms of the Indenture, the Common Shareholders shall nominate a non-employee Nominee to fill the unexpired term of the prior Noteholder Nominee.  If AT&T does not set forth three (3) candidates for a replacement Nominee within sixty (60) days of a vacancy occurring, the Common Shareholders shall nominate a non-employee and non-Affiliate Nominee to fill the unexpired term of the prior AT&T Nominee.

(g)     For so long there are any Notes or Preferred Shares outstanding, each Common Shareholder agrees not to take any action, or permit the Board to take any action, without the written consent of the appropriate nominating group, which consent may be given or withheld in such nominating group's sole discretion, to remove, without cause, any Nominee from the Board following his or her election thereto.  For so long there are any Notes or Preferred Shares outstanding, each Common Shareholder is permitted to take any action or permit the Board to take any action to remove a director for cause, with the nominating group having the right to nominate a substitute Nominee if the prior director is removed for cause.

(h)     For so long there are any Notes or Preferred Shares outstanding, if any Common Shareholder fails or refuses to vote its Common Shares as provided in this Section 13 (the "Director Breaching Shareholder"), without any further action by the Director Breaching Shareholder, (i) if the Corporation's Executive Chairman and/or Chief Executive Officer are members of the MBE Group, whomever are members of the MBE Group shall have an irrevocable proxy to vote and (ii) if the Corporation's Executive Chairman and Chief Executive Officer are not members of the MBE Group, the member of the Corporation's Board of Directors who is a member of the MBE Group shall have an irrevocable proxy to vote, the Director Breaching Shareholder's Common Shares to the extent such vote relates to any Nominee, and each Common Shareholder hereby irrevocably grants to and appoints the Corporation Executive Chairman and/or Chief Executive Officer or Director, as set forth above, individually or collectively, such Common Shareholder's proxy and attorney-in-fact (with full power of substitution), for and in the name, place and stead of such Common Shareholder, to vote such Common Shareholder's Shares in favor of any Nominee and otherwise as contemplated by this Section 13. Each Common Shareholder hereby affirms that (i) the irrevocable proxy set forth in this Section 13 is given in connection with, and as an inducement to, the execution by the nominee groups of this Agreement, and that such irrevocable proxy is given to secure the performance of the duties of the Common Shareholder under this Agreement, (ii) **the irrevocable proxy is coupled with an interest and may under no circumstances be revoked**, and (iii) all that such proxies and attorneys-in-fact may lawfully do or cause to be done by virtue hereof. A copy of this proxy shall be deemed filed with the secretary of the Corporation.

(i)     The Noteholders shall be third-party beneficiaries to this Section 13 as set forth in Section 32.

14.    <u>Conversion into Delaware Corporation</u>.

(a)    For so long as there are any Notes or Preferred Shares outstanding, if Common Shareholders representing more than twenty-five percent (25%) of the issued and outstanding Common Shares provide a written notice to the Corporation that such Common Shareholders request that the Corporation reincorporate into Delaware by means of conversion under applicable Delaware law, the Corporation and Shareholders shall take any and all action necessary to effect the conversion from a Texas corporation into a Delaware corporation.

(b)    For so long there are any Notes or Preferred Shares outstanding, if any Shareholder fails or refuses to vote its Shares in favor of the reincorporation into Delaware (the "<u>Reincorporation Breaching Shareholder</u>"), without any further action by the Reincorporation Breaching Shareholder, (i) the Corporation's Executive Chairman and Chief Executive Officer shall have an irrevocable proxy to vote the Reincorporation Breaching Shareholder's Shares to the extent such vote relates to the reincorporation of the Corporation into Delaware, and each Shareholder hereby irrevocably grants to and appoints the Corporation Executive Chairman and Chief Executive Offer, individually or collectively, such Shareholder's proxy and attorney-in-fact (with full power of substitution), for and in the name, place and stead of such Shareholder, to vote such Shareholder's Shares in favor of reincorporation of the Corporation into Delaware and otherwise as contemplated by this Section 14. Each Shareholder hereby affirms that (i) the irrevocable proxy set forth in this Section 14 is given in connection with, and as an inducement to, the execution by the nominee groups of this Agreement, and that such irrevocable proxy is given to secure the performance of the duties of the Shareholder under this Agreement, (ii) **the irrevocable proxy is coupled with an interest and may under no circumstances be revoked**, and (iii) all that such proxies and attorneys-in-fact may lawfully do or cause to be done by virtue hereof. A copy of this proxy shall be deemed filed with the secretary of the Corporation. Each Shareholder waives any dissenters' rights, appraisal rights and similar rights in connection with such reincorporation of the Corporation into Delaware.

15.    <u>Share Escrow Account</u>.  In order to effectuate and implement the Plan, the Company is required to (a) issue a stock dividend to the shareholders of record prior to the effectiveness of the Plan equal to 352,000 shares of Common Stock (the "<u>Dividend Shares</u>") which number of Dividend Shares is equal to the number of shares of Common Stock underlying the expected number of stock options to be outstanding on May 31, 2017 as adjusted pursuant to the terms of the stock options (the "<u>Underlying Shares</u>"), (ii) deposit such Dividend Shares with American Stock Transfer & Trust Company, LLC as the escrow agent ("<u>AST</u>") and (iii) enter into a Stock Escrow Agreement (the "<u>Escrow Agreement</u>") with AST pursuant to which (a) if a stock option is forfeited or otherwise terminated, the number of Dividend Shares equal to the number of Underlying Shares of such stock option would be released to the shareholders of record prior to the effectiveness of the Plan of the Company on a pro rata basis and (b) if a stock option is exercised, the number of Dividend Shares equal to the number of Underlying Shares of such stock option would be returned to the Company for cancellation or deposit into treasury. The Escrow Agreement, upon execution by the Company and AST, is incorporated by reference herein and deemed to be part of this Agreement.

16.    <u>Term</u>.  Unless extended as provided for herein, this Agreement shall terminate in its entirety and be of no force and effect upon the earlier of (i) the effective date of a written agreement providing for the termination of this Agreement signed (A) by the Common Shareholders holding in the aggregate at least a majority of the votes of which all of the Common Shareholders are entitled to cast, (B) by the Shareholders of the Preferred Stock holding the aggregate of at least a majority of the Preferred Shares, and (C) by the Required Noteholders, (ii) there are no more Notes or Preferred Shares outstanding, (iii) the closing of a Public Offering or (iv) the consummation of a merger or consolidation of the Corporation with an independent third party whereby the Corporation does not survive.

Notwithstanding the immediately preceding sentence, such a Public Offering, merger or consolidation shall not extinguish any obligations of a party at that time to make payments pursuant to this Agreement. A Shareholder shall cease being a party to this Agreement, and cease being bound hereby or subject hereto, when such Shareholder no longer holds any Shares.  The Noteholders shall be third-party beneficiaries to this Section 16 as set forth in Section 32.

17.    <u>Specific Enforcement</u>.  The Shareholders and the Corporation expressly agree that they will be irreparably damaged if this Agreement is not specifically enforced.  In any action or proceeding to specifically enforce the provisions of this Agreement, any person (including the Corporation) against whom such action or proceeding is brought hereby waives the claim or defense therein that the plaintiff or claimant has an adequate remedy at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists. Upon a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any Shareholder, any other Shareholder and/or the Corporation shall, in addition to all other remedies available with respect to such breach, be entitled to a temporary or permanent injunction, without showing any actual damage, and/or a decree for specific performance, in accordance with the provisions hereof. The provisions of this paragraph shall not prevent any party from seeking a remedy at law in connection with any breach of this Agreement.  The Noteholders shall be third-party beneficiaries to this Section 17 as set forth in Section 32.

18.    <u>Notices</u>.  Any notice under this Agreement shall be in writing and any written notice or other document shall be deemed to have been given at the address or facsimile number provided below or new address or facsimile number provided in accordance with this Section:  (i) on the date of personal service of the parties, (ii) on the third Business Day after mailing, if the document is mailed by registered mail and deposited in the mails postage pre-paid, (iii) one Business Day after being sent by professional or overnight courier, with all charges prepaid, or (iv) on the date of transmission if transmitted prior to 5:00 p.m. on a Business Day, recipient time, by facsimile machine or other means of electronic transmission, with receipt confirmed, or on the next Business Day following the date of transmission if transmitted after 5:00 p.m. on a Business Day, recipient time, or if such day is not a Business Day, by facsimile machine or other means of electronic transmission, with receipt confirmed. Any such notice shall be delivered or addressed to the Corporation or a Shareholder at the respective address as set forth below or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirements of this Section 18 shall not defeat the effectiveness of notice actually received by the addressee.  The Noteholders shall be third-party beneficiaries to this Section 18 as set forth in Section 32.

(a)    if to the Corporation:

Goodman Networks Incorporated
2801 Network Blvd., Suite 300
Frisco, Texas 75034
Facsimile: (972) 406-9291
Attn: John A. Goodman

with a copy (which shall not constitute notice) to:

Haynes and Boone, LLP
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Facsimile: (214) 200-0577
Attn: Gregory R. Samuel

(b)      if to a Shareholder, to the Shareholder's address as reflected in the stock records of the Corporation or as the Shareholders shall designate to the Corporation in writing.

(c)      if to a Noteholder, pursuant to the Indenture.

19.    <u>Assignment</u>.  Except as permitted by Section 2, this Agreement and the rights of the parties hereunder shall not be assignable by any of the parties hereto without compliance with this Agreement.

20.    <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of Texas.  The Noteholders shall be third-party beneficiaries to this Section 20 as set forth in Section 32.

21.    <u>Amendment</u>.  This Agreement may be amended, supplemented or interpreted at any time, but only by a written instrument executed by (i) Common Shareholders holding in the aggregate more than fifty percent (50%) of the aggregate Common Shares held by the Common Shareholders, (ii) Preferred Shareholders holding in the aggregate more than fifty percent (50%) of the aggregate Preferred Shares held by the Preferred Shareholders and (iii) the Required Noteholders solely with regard to any Section in which the Noteholders are third-party beneficiaries as set forth in Section 32.

22.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. The Noteholders shall be third-party beneficiaries to this Section 22 as set forth in Section 32.

23.    <u>Entire Agreement</u>.  This Agreement, together with other documents delivered pursuant hereto or incorporated by reference herein, including the Indenture and Escrow Agreement, contains the entire agreement between the parties hereto concerning the transactions contemplated herein and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter hereof, including without limitation the Fifth Amended and Restated Shareholders' Agreement.  No oral representation, agreement or understanding made by any party hereto shall be valid or binding upon such party or any other party hereto. The Noteholders shall be third-party beneficiaries to this Section 23 as set forth in Section 32.

24.    <u>Effect of Other Laws and Agreements</u>.  The rights and obligations of the parties under this Agreement shall be subject to any restrictions on the purchase of stock of the Corporation which may be imposed by the Texas Business Organizations Code or any agreement now or hereafter entered into between the Corporation and any financial institution with respect to loans or other financial accommodations made to the Corporation. Nothing contained herein shall be deemed to limit the obligations and duties imposed upon officers and directors in accordance with state and federal laws.  The Noteholders shall be third-party beneficiaries to this Section 24 as set forth in Section 32.

25.    <u>Further Assurance</u>.  Each party hereto shall do and perform, or cause to be done and performed, all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments and documents as any other party hereto may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby. The right of the Corporation to acquire Shares pursuant to this Agreement is subject to the laws of the State of Texas governing the rights of a corporation to acquire its own shares. If the Corporation is unable to acquire Shares hereunder because of the limitations contained in the Texas Business Organizations Code or other such applicable statute, the Corporation and its shareholders may in their sole discretion take such action that is reasonable to enable the Corporation to lawfully acquire such

Shares or as many of such Shares as may be lawfully acquired.  The Noteholders shall be third-party beneficiaries to this Section 25 as set forth in Section 32.

26.    <u>Captions and Section Headings</u>.  Except as used in Section 1, captions and Section headings used herein are for convenience only and are not a part of this Agreement and shall not be used in construing it.  The Noteholders shall be third-party beneficiaries to this Section 26 as set forth in Section 32.

27.    <u>Waiver</u>.  Any waiver by any party hereto of any of his, her or its rights hereunder shall be without prejudice of his, her or its future assertion of any such rights, and any delay in exercising any rights shall not operate as a waiver thereof.  The Noteholders shall be third-party beneficiaries to this Section 27 as set forth in Section 32.

28.    <u>Severability or Provisions</u>. If any one or more of the provisions of this Agreement shall be determined to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions of this Agreement shall not be impaired in any way. The Noteholders shall be third-party beneficiaries to this Section 28 as set forth in Section 32.

29.    <u>Shareholder Rights and Obligations</u>.  The rights and obligations of the Shareholders hereunder are several and not joint.  The Noteholders shall be third-party beneficiaries to this Section 29 as set forth in Section 32.

30.    <u>Arbitration</u>.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the AAA Rules by three (3) arbitrators. The arbitrators shall be appointed in accordance with the AAA Rules regarding appointment from the AAA panel of arbitrators. The arbitration shall be held in Collin County, Texas. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  The Noteholders shall be third-party beneficiaries to this Section 30 as set forth in Section 32.

31.    <u>Spousal Consents</u>.  Any spouse of a Shareholder shall, upon an individual becoming a Shareholder if such individual is not a Shareholder as of the date of this Agreement, or within thirty (30) days after the marriage of an individual who is a Shareholder as of the date of this Agreement, execute and deliver to the Corporation a spousal consent, in a form substantially similar to the spousal consents following the signature pages to this Agreement.

32.    <u>Third-Party Beneficiaries</u>.  Except for the Noteholders with regard to Sections 13, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 and 32 only, nothing in this Agreement shall provide any benefit to any third Person or entitle any third Persons to any claim, cause of action, remedy or right of any kind, it being the intent of the parties hereto that this Agreement shall otherwise not be construed as a third-Person beneficiary contract.

* * * * *

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

**CORPORATION**:

GOODMAN NETWORKS INCORPORATED

By: _____
    Name: John A. Goodman
    Title:  Executive Chairman, Chief Executive Officer
         and President

**SHAREHOLDERS SET FORTH ON <u>SCHEDULE A</u>
ARE DEEMED TO BE PARTIES TO THIS
AGREEMENT PURSUANT TO THE PLAN**

*Signature Page to the Sixth Amended and Restated Shareholders' Agreement*

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

**SHAREHOLDER**:

Jonathan E. Goodman

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

**SHAREHOLDER**:

**2012 JONATHAN EDWARD GOODMAN FAMILY TRUST**

By:

Name: _Jonathan Goodman_

Title: _Vice President_

*Signature Page to the Sixth Amended and Restated Shareholders' Agreement*

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

**SHAREHOLDER**:

**GOODMAN MBE GROUP LP**

By: Goodman MBE Group GP LLC, its general partner

By: _____

Name: _Jonathan Goodman_____

Title: _Vice President_____

*Signature Page to the Sixth Amended and Restated Shareholders' Agreement*

**Schedule A**

**Shareholders Deemed Party to this Agreement Pursuant to the Plan**

James E. Goodman
Jason A. Goodman
John A. Goodman
Joseph M. Goodman
Gabriela Sutto Goodman Family Trust
2012 Joseph Mark Goodman Family Trust
John Andrew Goodman 2012 Family Trust
Cayenne Soni Goodman Family Trust
The Goodman Foundation
Ron Hill
William Darkwah
Skip Hulett
Scott Pickett
Alarica M. Pickett
Timisoara E. Pickett
SEP Trust
Alcatel-Lucent USA Inc.
SG-GN/SD, LLC

[Additional holders of claims who do not otherwise execute this Agreement to be added to this Schedule A by the Company as such holders are identified.]

*Schedule A to the Sixth Amended and Restated Shareholders' Agreement*

**Schedule B**

**Initial List of Competitors**

Ansco & Associates, LLC
Bechtel Corporation
Black & Veatch Holding Company
BlueStream Professional Services
Clear Sky
Digital Satellite, Inc.
DirectSat/Unitek Global Services
DW Direct
Dycom Industries, Inc.
Empath
Empire Telecom
Erickson
Jacobs Engineering Group
Mastec
Nexius Solutions, Inc.
Parsons Corporation
Science Applications International Corporation (SAIC)
Starlight STM
Velocitel, Inc.